AUTORIDAD SOBRE HOGARES DE PUERTO RICO, peticionaria, *v.*
TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN,
HON. LUIS R. POLO, JUEZ, demandado; XAVIER ZEQUEIRA,
interventor.

Número 2354.

*Sometido:* 5 de mayo de 1960.   *Resuelto:* 11 de abril de 1961.

*Berta Font de Estades, Pablo Defendini, Octavio Malavé Torres y Luis Torres*, abogados de la peticionaria; *Víctor Gutiérrez Franqui, Luis F. Sánchez Vilella, C. Morales, Jr., y Federico Ramírez Ros*, abogados del interventor.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

Expedimos certiorari bajo el artículo 28 de la Ley 376 de 8 de mayo de 1951, —32 L.P.R.A. 3228, —para revisar la sentencia dictada por la Sala de San Juan del Tribunal Superior confirmando un laudo de arbitraje en los casos de Autoridad sobre Hogares de Puerto Rico *v.* Xavier Zequeira, 55–6073 y Zequeira *v.* Autoridad sobre Hogares, 56–426 (consolidados) sobre impugnación y confirmación de laudo, respectivamente.

El 12 de julio de 1949 la Autoridad y Zequeira formalizaron un contrato para la construcción del Caserío San José,

PRHA–17, por el precio de $987,976. De acuerdo con la cláusula 17 del contrato (a) todas las disputas relativas a cuestiones surgidas bajo las secciones 35 a 49 de las Condiciones Generales se decidirían por la Autoridad y la decisión de la Autoridad sería final y obligatoria, excepto en lo que de otro modo expresamente se proveyera en el contrato. (b) Todas las demás disputas surgidas bajo el contrato se decidirían por el Director Ejecutivo, excepto disputas relativas a la concesión o al monto de reclamaciones que envolvieran un cambio en el precio del contrato, que serían decididas por el Director Ejecutivo sujeto a arbitraje. Si la Autoridad o el contratista pidieran arbitraje de cualesquiera de dichas disputas, la petición se comunicaría por escrito a la otra parte dentro de 10 días a partir de la fecha de la decisión o demanda sobre la cual se solicitare arbitraje. De no solicitarse arbitraje, la decisión o demanda sería final y obligatoria para la otra parte. Un árbitro se nombraría por la Autoridad y otro por el contratista, y de no ponerse estos de acuerdo dentro de 10 días nombrarían ellos un tercer árbitro, y la decisión de dos sería concluyente. En ningún caso las obras se suspenderían pendiente el arbitraje, excepto por instrucciones escritas del Director Ejecutivo permitiendo el paro.[1]

De acuerdo con la prueba que desfiló ante los árbitros que emitieron el laudo objeto de estos procedimientos, en la

---

[1] Surgió una disputa entre la Autoridad y Zequeira y nombraron sus respectivos árbitros quienes discreparon en informes escritos. El tercer árbitro consideró ambos informes y en 6 de octubre de 1955 rindió el suyo con sus conclusiones a favor del contratista. En 29 de diciembre de 1955 la Autoridad impugnó este laudo ante la Sala de San Juan del Tribunal Superior, entre otras cosas, porque no se rindió dentro del término que fija la ley; porque no estaba firmado por todos los árbitros o una mayoría de ellos, y porque se incurrió en errores que perjudicaban a la Autoridad al basar el tercer árbitro sus conclusiones en prueba ofrecida cuando él no estaba presente, todo ello en alegada violación de la Ley 376 de 8 de mayo de 1951. En 2 de mayo de 1956 el Tribunal Superior anuló dicho laudo por incumplimiento de requisitos procesales, y no encontrando motivo de incapacidad de los árbitros, dispuso que se sometiera nuevamente la controversia a los mismos con oportunidad a ambas partes de ser oídas y de presentar prueba.

vista celebrada por ellos, ocurrió lo siguiente: Parte del proyecto consistía de un área de relleno para el cual venía un mapa topográfico con los puntos de niveles existentes, y otro para el relleno terminado de la obra según el contrato. Notando que había algo que no estaba claro en cuanto a los puntos dados en el mapa topográfico de la Autoridad, el contratista solicitó de ésta que llevara a cabo un nuevo plano y tomase nuevos puntos en esa área para comprobar si los contornos expuestos en el plano eran correctos.

En 20 de abril de 1950 el contratista se dirigió al ingeniero de la Autoridad Sr. Hidalgo solicitando información sobre la topografía que había ordenado hacer la Autoridad y haciendo constar que la pendiente natural que aparecía en los planos no era la verdadera por razones que exponía, y que esto cambiaba las condiciones del contrato. Solicitaba negociar la orden de cambio pertinente. En 5 de mayo de 1950 el ingeniero Sr. Hidalgo comunicó al contratista que una topografía que ordenó hacer la Autoridad a petición de aquél estaba terminada y se hacían los cómputos para determinar si había cambio alguno en el volumen de relleno, y que posiblemente habría un aumento. Tan pronto tuvieran los informes completos prepararían una orden de cambio para cubrir la diferencia.

En diciembre 4 de 1950 la Autoridad envió al contratista la Orden de Cambio núm. 13 informándole que revisado el relleno a ser depositado en determinada área se necesitaba un relleno adicional en la cantidad de 2,287.74 yardas cúbicas que el contratista procedería a depositar de acuerdo con los planos originales. Se incluía un nuevo plano indicando datos de medidas y se hacía un ajuste equitativo del precio del contrato en la cantidad de $1,687.75. La referida orden de cambio incluía el siguiente desglose:

"*Adiciones:*
2,287.74 yardas cúbicas de relleno
a $0.80...............................  $1, 830. 19

*Deducciones:*
284.88 yardas cúbicas de excavación
Total adiciones ............... $1, 830. 19
Total deducciones ...........    142. 44

Aumento total en el precio del contrato...   $1, 687. 75"

En marzo 6 de 1951 el contratista se dirigió a la Autoridad en relación con la referida Orden de Cambio núm. 13 informando que no aceptaba la misma debido a que la cantidad de relleno envuelta era mayor que la allí mencionada en un total de 42,364 yardas cúbicas, que a $0.80 la yarda montaba a $33,891.20 sin incluir el 15 por ciento estipulado para el contratista. Que la nueva nivelación preparada por la Autoridad a petición suya se había hecho sin que se le diera a él ingerencia alguna, y solicitaba se hiciera otra orden de cambio por la diferencia en la cantidad de relleno que real y verdaderamente había servido al proyecto. En mayo 7 de 1951 el contratista informó a la Autoridad que con posterioridad a la carta anterior había depositado la cantidad adicional de 2,134.56 yardas cúbicas de relleno que a razón de $0.80 montaba a $1,707.65, ascendiendo su reclamación a $35,598.85 sin incluir el 15 por ciento del contratista.

En 18 de diciembre de 1951 el contratista le envió una comunicación al Director Ejecutivo refiriéndose a conversaciones con el ingeniero Sr. Hidalgo sobre la liquidación de los proyectos, haciendo constar que la condición distinta del proyecto 17 fue los niveles en el mapa topográfico que señalaron puntos que no arrojaban la verdad, y reafirmando que la orden de cambio se hizo por una cantidad de relleno menor a la verdadera. Que en vista de que el Sr. Hidalgo le exigía presentar un nuevo mapa con el cual él pudiera probar su reclamación, estaba en conversaciones con la firma Deer &

Capacete para que procedieran a hacer los tanteos necesarios y computar el relleno suplido por él.

En 24 de octubre de 1953 el contratista envió al Director Ejecutivo un estudio hecho por la Foundation Engineering Co. of Puerto Rico consistente en un mapa topográfico del área rellenada en el proyecto San José, el cual determinaba la cantidad de relleno existente, reafirmando el contratista que no siendo correcto el mapa topográfico original de la Autoridad porque indicaba contornos erróneos, habían condiciones distintas a las de los planos. Indicaba que dicha firma había encontrado 120,603 metros cúbicos de relleno, 33,870 más que el plano original, que representaban 44,302.16 yardas cúbicas, o $35,441.61 a $0.80 la yarda según el precio preconvenido, más el 15 por ciento para un total de $40,757.84, menos $1,687.75 acreditados por la Orden de Cambio núm. 13. En relación con esta carta, en 9 de noviembre de 1953 el Director Ejecutivo comunicó al contratista que habiendo estudiado la documentación relacionada con el contrato y el historial del mismo, no encontraban fundamento alguno para justificar la reclamación y denegaban la misma.

En 1ro de diciembre de 1953 el contratista se dirigió al Director Ejecutivo, y refiriéndose a conversaciones recientes sobre su reclamación y a una indicación del Director sobre la conveniencia de que los ingenieros de la Foundation Engineering Co. que realizaron el estudio sobre el relleno utilizado comparecieran a una vista ante el Director a los fines de discutir los detalles del informe, pedía la fecha y hora para dicha conferencia a ver si se podía llegar a una decisión final sobre el asunto satisfactoria para ambas partes. En 4 de enero de 1954 el Director Ejecutivo se dirigió al contratista confirmándole lo que le dijera durante una conferencia celebrada el 4 de diciembre, de que en vista de las circunstancias del caso y los términos del contrato no existía fundamento para justificar su reclamación.

En 13 de enero de 1954 el contratista se dirigió al Director Ejecutivo solicitando que la controversia sobre el exceso de relleno fuera sometida a arbitraje de acuerdo con el párrafo 17(b) del contrato, y le informaba que estaba nombrando como su árbitro al Lcdo. Gustavo E. Padilla. En 3 de febrero de 1954 el Director Ejecutivo contestó la anterior carta informando al contratista que había designado al ingeniero Sr. Jorge J. Jiménez para actuar como árbitro a nombre de la Autoridad en cuanto a dicha disputa.

En adición a la prueba documental reseñada estuvo ante los árbitros el resultado de un informe rendido por la firma Deer & Capacete fechado 8 de octubre de 1953. Tanto el contratista, como el Director Ejecutivo y otros funcionarios de la Autoridad, representada ésta por abogado, expusieron ante los árbitros ampliamente sus explicaciones en torno a dicha prueba documental y a los estudios realizados por las dos firmas mencionadas, sostuvieron sus respectivos criterios en cuanto a los aspectos técnicos envueltos en la controversia, y dieron sus respectivas interpretaciones de aquellas partes del contrato relacionadas con la disputa. El árbitro nombrado por el contratista, Lcdo. Gustavo E. Padilla, y el tercer árbitro Sr. Joaquín Oliver, suscribieron un laudo en el cual expusieron diez conclusiones.(²)  A la luz de las mismas resolvieron que el contratista tenía derecho a un pago adicional por 28,460.20 metros cúbicos de relleno al precio unitario de $1.07, equivalente a la cantidad de $30,452.41; y que el contratista no tenía derecho al pago del 15 por ciento del beneficio industrial ya que sus beneficios estaban comprendidos en el precio de $1.07 cotizado. El árbitro nombrado por la Autoridad, Sr. Jiménez, hizo constar en el propio documento que aunque estaba de acuerdo con las diez conclusiones de los otros dos árbitros, no aprobaba la resolución de adjudicar pago adicional por tratarse de un contrato de precio alzado

---

(²) Se unen como *Apéndice A* al final de esta opinión.

y por no haberse aprobado que hubiera habido mala fe de parte de la Autoridad en la preparación del plano topográfico sino que fue un error casual.

La Autoridad impugnó el laudo ante el Tribunal Superior y el contratista, por su parte, solicitó la confirmación del mismo.(3) Oídas las partes la Sala sentenciadora hizo las siguientes conclusiones de derecho: (1) a los fines de determinar la validez del laudo de arbitraje en este caso, se aplica la Ley núm. 376 de 8 de mayo de 1951, ley ésta que autoriza y reglamenta los convenios de arbitraje comercial; (2) que a la luz de la referida ley las determinaciones de los árbitros en cuanto a los hechos en relación con la controversia sometida, al igual que en cuanto a cuestiones de derecho, son finales y no son revisables por los tribunales y que dicho estatuto, en su artículo 22, establece específicamente las causales que pueden dar lugar a la revocación de un laudo de

(3) Los motivos que adujo la Autoridad para impugnar el laudo fueron los siguientes: (a) que la concesión al contratista de la suma adicional de $30,452.41 por concepto del exceso de relleno era en violación de los términos del contrato bajo el cual aquél venía obligado a suplir el relleno adicional dentro del precio alzado de $987,976; (b) que los árbitros cambiaron la naturaleza del contrato de uno por precio alzado a uno por precio unitario; (c) que los árbitros actuaron en forma ilegal, excediéndose en sus funciones, al ignorar los términos del contrato; (d) que los árbitros hicieron a la Autoridad garantizadora de las condiciones del terreno y de la información concerniente a las mismas en violación de los términos expresos del contrato, según el cual ambas partes estipularon que cualquier información de esta naturaleza suplida por la Autoridad era aproximada y ésta no asumía responsabilidad alguna en cuanto a su exactitud; (e) que los árbitros cometieron error que aparece de la faz del laudo al decidir, en violación del contrato, que el documento conocido como *"Schedule of Amounts for Contract Payment"* constituía un estimado de obra de trabajo y de gastos; (f) que el laudo era contrario a la política pública al permitir una cantidad adicional al monto del contrato, y (g) que siendo el laudo en tal extremo erróneo e ilegal éste resultaba en violación de las intenciones de la Autoridad al someterse al arbitraje.

En una moción de reconsideración después de fallado el caso la Autoridad planteó adicionalmente que el convenio de arbitraje no incluía la materia que le fue sometida a los árbitros; que el Director Ejecutivo no tenía autoridad para someter la disputa a arbitraje, y que el contratista no solicitó el mismo dentro de los 10 días estipulados en el convenio, por lo cual el Director tampoco tenía facultad para ir al arbitraje.

arbitraje y entre ellas no se incluyen meros errores de hecho o de derecho cometidos por los árbitros al resolver las controversias que les son sometidas; (3) que dichos errores de hecho o de derecho no constituyen base para revocar a tenor de lo dispuesto en el inciso (c) del artículo 22, ya que la disposición de ese inciso referente a cualquier error que perjudique los derechos de cualquiera de las partes debe interpretarse que se refiere a errores en la forma de conducir el procedimiento de arbitraje siendo de aplicación la máxima de interpretación estatutaria *"ejusdem generis"*;[4] (4) que de interpretar que el legislador intentó que las determinaciones de los árbitros en cuanto a los hechos y en cuanto a derecho fuesen revisables por las cortes, ello equivaldría a imputarle al legislador el querer desvirtuar el procedimiento de arbitraje y destruir el propósito del mismo. En vista de las anteriores consideraciones concluyó la Sala como cuestión de derecho que los alegados errores cometidos por los árbitros en la apreciación de los hechos y en la aplicación de la ley no podían dar lugar a la revocación del laudo. Concluyó también como cuestión de derecho, que los árbitros en forma alguna se excedieron de su jurisdicción al rendir el laudo en este caso y que tampoco se había demostrado que dicho laudo fuera contrario a la política pública. A tenor de dichas conclusiones la Sala de instancia dictó sentencia confirmando el laudo. La revisión ante nos mediante certiorari que concede el artículo 28 de la Ley 376 contra la sentencia así dictada está limitada a cuestiones de derecho.

La primera de las cuestiones planteadas por la peticionaria en este recurso es que la Sala sentenciadora cometió error al decidir que las determinaciones de los árbitros en cuanto a los hechos y en cuanto a cuestiones de derecho son finales y no revisables por los tribunales.

---

[4] "Cuando los árbitros actuaren erróneamente al rehusar posponer la vista luego de mostrarse causa justificada para ello, o al rehusar oir evidencia pertinente y material a la controversia, o cuando incurrieren en cualquier error que perjudique los derechos de cualquiera de las partes."

En *Ríos* v. *Puerto Rico Cement Corporation*, 66 D.P.R. 470, resuelto en 1946, expresamos que como regla general un laudo de arbitraje "puede ser impugnado o anulado si existe algún defecto o insuficiencia en la sumisión o en el laudo mismo que lo invalide, o cuando el procedimiento seguido se ha desviado de manera substancial y perjudicial de las reglas que gobiernan los procedimientos por y ante árbitros." También, que "[l]os tribunales no se inclinan fácilmente a decretar la nulidad de un laudo de arbitraje, y no deben permitir que los mismos sean impugnados a menos que contra ellos pueda levantarse una de las objeciones antes mencionadas o que se alegue y pruebe fraude o mala conducta o la comisión de un grave y perjudicial error que equivalga a una violación del derecho a un debido procedimiento de ley." En el caso posterior de *Junta de Relaciones del Trabajo* v. *New York & Porto Rico Steamship Co.*, 69 D.P.R. 782, resuelto el 31 de marzo de 1949, este Tribunal hizo una pormenorizada exposición del problema aquí planteado y dijo, decisivamente apoyado por decisiones y otras autoridades de incuestionable y general aceptación: (pág. 797, 800)

"La compañía alega que el laudo es nulo debido a errores de derecho cometidos por el Comité de Arbitraje.

.   .   .   .   .   .   .   .

"Un laudo de arbitraje no es ni un contrato ni una sentencia, pero disfruta de la naturaleza de ambos. Por consiguiente, los motivos por los cuales un laudo, basado en una sumisión voluntaria, puede ser impugnado se reducen a (1) fraude, (2) conducta impropia, (3) falta del debido procedimiento en la celebración de la vista, (4) violación de la política pública, (5) falta de jurisdicción, y (6) que el laudo no resuelva todas las cuestiones en controversia que se sometieron. Updegraff y McCoy, supra, págs. 124–27. Esto quiere decir que un laudo 'no puede anularse por meros errores de criterio ya sean éstos en cuanto a la ley o en cuanto a los hechos.' (Citas.)

"Según indicó la Junta en la vista oral de este caso, ella o este Tribunal quizá hubieran llegado a una conclusión distinta si las cuestiones hubieran sido sometidas a ella o a nosotros. *Pero las partes que firman un convenio de esta naturaleza deben*

*comprender que han sustituído al árbitro por las cortes para la
determinación de todas las cuestiones de hecho y de derecho
sustantivo.* La compañía renunció su derecho a litigar tales
cuestiones ante los tribunales. No estamos autorizados para
devolvérselo. [Énfasis adicionado].

* * * * * * *

"La situación sería diferente si el convenio colectivo o la
sumisión a arbitraje hubieran provisto que el Comité de arbi-
traje deberá decidir las cuestiones sometídasle de acuerdo a de-
recho. 'Cuando las partes así lo disponen, los árbitros deben
seguir las reglas de derecho, y rendir sus laudos a tenor con las
doctrinas legales prevalecientes. Si el convenio de arbitraje
nada dice en cuanto a esto, de conformidad con la Ley Común
y bajo la mayoría de las leyes de arbitraje, los árbitros pueden
declarar cuál es la ley, y ningún laudo será anulado a causa de
sus errores de derecho. (Citas.) Una de las primeras auto-
ridades sobre arbitraje es de la creencia que éste sería más
efectivo si las cortes pudieran revisar los laudos sobre cues-
tiones de derecho sustantivo. Phillips, supra, 47 Harv. L. Rev.,
a las págs. 609 *et seq.* Pero en ausencia de una disposición en
tal sentido en el convenio de arbitraje o en un estatuto, el árbi-
tro tiene autoridad para hacer caso omiso de las reglas de
derecho sustantivo." (5)

Véanse también: *Junta de Relaciones del Trabajo* v. *Eastern
Sugar*, 69 D.P.R. 818, 820 (1949) ; *Junta de Relaciones del
Trabajo* v. *Soc. Mario Mercado e Hijos*, 74 D.P.R. 403, 407–8
(1953) ; *Junta de Relaciones* v. *Orange Crush of Puerto Rico*,
80 D.P.R. 292, 295 (1958).

---

(5) En este caso se aclaró que al decirse en el de *Ríos* v. *Puerto Rico
Cement Corp.*, supra, que como regla general un laudo podía impugnarse
o anularse si existía algún defecto o insuficiencia en la sumisión o en el
laudo mismo que lo invalidara, o cuando el procedimiento seguido se hu-
biere desviado de manera sustancial o perjudicial de las reglas que go-
biernan los procedimientos por y ante árbitros, no hubo el propósito de
resolver que un laudo podía impugnarse por errores de derecho sustantivo,
y sí que si el árbitro actúa con jurisdicción solamente los errores de
fraude, conducta impropia o falta del debido procedimiento podían invocarse
ante las cortes en contra del laudo; adicionándose a dichos motivos la
violación de la política pública y que el laudo no hubiere resuelto todas
las cuestiones en controversia sometidas. Si bien esos casos surgen de
disputas obrero-patronales, en el aspecto que ahora consideramos no hay
diferencias en cuanto a la norma a seguirse en un arbitraje comercial.

Adoptamos en los casos de *Ríos* y de *Junta* v. *New York & Porto Rico Steamship*, por vía de doctrina a regir entre nosotros, aquellos principios relativos al efecto del laudo arbitral y el ámbito de su revisión judicial permisible vigentes en los distintos estados así como en la jurisdicción federal, tanto bajo el derecho común como a tenor de legislación positiva sobre procedimientos de arbitraje, principios éstos que por no controvertidos a través del tiempo y por ya tan evidentes, han pasado a ser sobre el particular el derecho aplicable, de general e indiscutible aceptación. Véanse, entre las muchas otras decisiones posteriores: *Amicizia Societa Nav.* v. *Chilean Nitrate & Iodine S. Corp.*, (C.A. 2, 1960), 274 F.2d 805, 808–809; *Application of Harris*, (1959), 337 P.2d 832, 833–834; *Smith* v. *Hillerich & Bradsby Co.*, (1952), 253 S.W. 2d 629, 630; *Kesslen Bros., Inc.* v. *Board of Conciliation & Arb.*, (1959), 158 N.E.2d 871, 873; *Wetsel* v. *Garibaldi*, (1958), 323 P.2d 524, 529–530; *Arbitration: A. D. Juilliard & Co., etc.*, (1956), 152 N.Y.S.2d 394, 396; *Brighton Mills* v. *Rayon Corp., etc.*, (1953), 122 N.Y.S.2d 113; *Wagner* v. *Russeks Fifth Ave., Inc.*, (1953), 119 N.Y.S.2d 269, 270; *Griffith Co.* v. *San Diego College for Women* (1955), 289 P.2d 476, 481, 484–485; *Dembitzer* v. *Gutchen*, (1957), 159 N.Y.S.2d 327, 331–332; *Karppinen* v. *Karl Kiefer Machine Co.*, (C.A. 2, 1950), 187 F.2d 32, 34–35; *In re Suffolk & Nassau Amusement Co., etc.*, (1955), 143 N.Y.S.2d 427, 431–432; *Downer Corp.* v. *Union Paving Co.*, (1956), 304 P.2d 756, 146 C. A. 2d 708, 714–716; *Pennsylvania Electric Co.* v. *Shannon*, (1954), 105 A.2d 55, 57–58; *Application of Shapiro*, (1950), 97 N.Y.S.2d 644, 649; *Loretta Realty Corp.* v. *Massachusetts Bond & Ins. Co.*, (1955), 114 A.2d 846, 848–849; *Crofoot* v. *Blair Holdings Corp.*, (1953), 260 P.2d 156, 170–172. Cf: *Wilko* v. *Swan*, (1953), 346 U.S. 427, 435–438; *Bernhardt* v. *Polygraphic Co.*, (1956), 350 U.S. 198, 202–204; *Steelworkers* v. *Ameri-*

*can Mfg. Co.*, (1960), 363 U.S. 564, 567–568; *United States* v. *Moorman*, (1950), 338 U.S. 457, 461–463; *Mork* v. *Eureka Security Fire, etc.*, (1950), 42 N.W.2d 33, 38–39.[6]

En *Wilko* v. *Swan*, supra, precisamente con miras a esas características del laudo arbitral sostuvo el Tribunal Supremo que un convenio de sumisión a arbitraje de una disputa entre un comprador y un vendedor de valores bajo la Ley de Valores (*"Securities Act"*) de 1933 era nulo por ser contrario a la política pública de dicho estatuto, ya que mediante arbitraje el comprador afectado renunciaba a ciertos remedios judiciales provistos en esa ley que le beneficiaban. Dijo el Tribunal que aunque las disposiciones de la Ley de Valores favorables al comprador se aplicaban, la efectividad de las mismas se mermaba en un arbitraje comparado con un procedimiento judicial. El caso, se dice, requería conclusiones subjetivas sobre el propósito y el conocimiento de un alegado violador del estatuto que tenían que determinarse y aplicarse por los árbitros *sin una instrucción judicial de la ley.* Como el laudo de ellos podía darse sin explicar sus razones y sin un récord completo de sus procedimientos, el concepto de los árbitros sobre el significado legal de requisitos estatutarios

---

[6] Véanse, por ejemplo, los procedimientos de arbitraje de California desde mediados del pasado siglo, según fueron radicalmente modificados por legislación del año 1927 basada en el *Proyecto de Ley Estatal de Arbitraje* auspiciado por la Asociación Americana de Arbitraje, seguido también por otros estados, —Código de Enjuiciamiento Civil de California, secs. 1280 a la 1293, 19 West's *Annotated Cal. Codes*, págs. 626 a 672—; las disposiciones sobre arbitraje de Nueva York, New York Civil Practice Act, Art. 84 (1920, 1937), Gilbert-Blis *Civil Practice Act of New York Annotated*, Vol. 6B, secs. 1448 a la 1469; la Ley de Arbitraje de Estados Unidos (1947), 9 U.S.C.A. secs. 1 a la 11.

La doctrina en el derecho español contiene normas similares a la angloamericana. Bajo los procedimientos de arbitraje de la Ley de Enjuiciamiento Civil de 1881, arts. 487 y 790 al 839 que en ausencia de otra ley aplicable aquí regían—Cf: *Más* v. *Llona*, 31 D.P.R. 30 (1922)—hasta que entró en vigor la Ley 376 de 1951, si las partes optaban por someter la controversia al juicio de Jueces árbitros, éstos serían *Letrados* (art. 790) y la sentencia arbitral debía ser *conforme a derecho* y a lo alegado y probado, con las *solemnidades* prevenidas para las sentencias de los juicios ordinarios (art. 816). La sentencia era *apelable en ambos efectos*

tales como "peso de la prueba", "cuidado razonable" o "hecho material" no podría ser examinado, y el poder para revocar el laudo era limitado. (Se cita la sec. 10 de la Ley de Arbitraje de Estados Unidos, 9 U.S.C.A. núm. 10). En una sumisión no cualificada como la de ese caso, continúa la opinión, la interpretación de la ley por los árbitros en contraste con su manifiesta desatención no estaba sujeta a revisión judicial en las cortes federales por error de interpretación. Expresando que el caso presentaba dos normas de política pública que no eran fácilmente reconciliables, finalmente dijo el Tribunal que el Congreso ha concedido a las partes en transacciones sujetas a su poder legislativo la oportunidad de obtener una pronta, económica y adecuada solución de las controversias mediante arbitraje si las partes están prontas a aceptar *"una menor certeza de una solución legalmente correcta,"* pero aún reconociendo las ventajas que ofrecen los acuerdos de arbitraje para la solución de controversias comerciales, entendía el Tribunal que la intención del Congreso relativa a la venta de valores se cumplía mejor sosteniendo nulo tal convenio de arbitraje de controversias surgidas bajo dicha ley.

---

ante la Audiencia del distrito y la apelación se sustanciaba de acuerdo con las reglas para las apelaciones del juicio de mayor cuantía (arts. 816, 823).

Por otra parte, si los interesados optaban por someter la disputa al juicio de amigables componedores, éstos podían ser varones mayores de edad que supieran leer y escribir en goce de sus derechos civiles (art. 827), y decidirían las cuestiones sometidas a sus fallos *sin sujeción a formas legales y según su saber y entender* (art. 823). Contra tales fallos sólo procedía el recurso de *casación* (art. 836) por haber dictado los amigables componedores la sentencia fuera del plazo señalado en el compromiso o resuelto puntos no sometidos a su decisión o que no fueran de índole civil o estuvieran comprendidos en las excepciones del artículo 487 (art. 1691(3)). Véanse las sentencias del Tribunal Supremo de España de 6 de diciembre de 1941 sosteniendo que quedan subsistentes e inatacables, *sean o no acertadas en cuanto al fondo,* las sentencias de los componedores que no se han extralimitado en cuanto a la materia o cuestiones cuya solución se les encomendara, etc.; las de 15 de noviembre de 1934 y 15 de marzo de 1933; y la de 17 de abril de 1943 sosteniéndose que la misión del Tribunal Supremo es dejar sin efecto lo que constituya exceso en el laudo de amigables componedores, *pero no corregir sus deficiencias u*

La conclusión de la Sala sentenciadora en cuanto al error apuntado es correcta y constituye una expresión, puede decirse ya de orden axiomático, del derecho sobre el particular. Sostiene sin embargo la recurrente que esos criterios no rigen en Puerto Rico, y que la Sala venía obligada a revisar al laudo en su fondo y a revocarlo fundado en errores de los árbitros y apreciaciones de derecho equivocadas. Para ello invoca lo dispuesto en el inciso (c) del artículo 22 de la Ley 376 de 1951.

En los casos en que el laudo puede ser revocado, el inciso (c) dice cuando los árbitros actuaren erróneamente al rehusar posponer la vista luego de mostrarse causa justificada para ello, o al rehusar oir evidencia pertinente y material a la controversia o *"cuando incurrieren en cualquier error que perjudique los derechos de cualquiera de las partes."* Concluyó la Sala sentenciadora, siguiendo la máxima *"ejusdem generis"* que en la última disposición se concibe un error similar o de parecida naturaleza a los procesales que le preceden. En verdad, cuando se mira tal disposición a la luz de todo el resto del artículo y del estatuto, de la procedencia del mismo y de la jurisprudencia de origen, no puede decirse

*omisiones.* El arbitrador o amigable componedor, lo señala Escriche en su Diccionario Razonado de Legislación y Jurisprudencia, refiriéndose a las Partidas, como "[e]l hombre bueno en quien las partes se comprometen para que por vía de *equidad* ajuste y transija sus controversias. . . . Los arbitradores pueden oir las razones de ambas partes y avenirlas y librar sus contiendas en. cualquier modo que tengan a bien; y *será válido lo que determinen,* aunque no hagan comenzar el pleito por demanda y contestación, *ni observen las demás formalidades* que deben guardar los demás jueces, *con tal que obren de buena fe y sin engaño;"* . . . Escriche señala la diferencia en las Partidas entre el *árbitro de derecho* o *árbitro,* que debían proceder y determinar con arreglo a las leyes y los *arbitradores,* amigables componedores que podían proceder y determinar según su leal saber y entender, sin arreglarse a derecho ni sujetarse a las formas legales. No cabe duda que el árbitro angloamericano y el amigable componedor español responden históricamente a una ideología común en cuanto a la naturaleza y fines de tales encomiendas. A mayor abundamiento, véase la nueva legislación española—Ley de 22 de diciembre de 1953—que regula los arbitrajes de Derecho Privado, en que se adoptan normas más en común con la institución arbitral angloamericana.

que la regla de interpretación estatutaria no sea del todo aplicable, y que fue errónea la conclusión de la Sala.

Considerando, sin embargo, que de tener razón la recurrente regiría entre nosotros un criterio en cuanto al laudo arbitral y su revisión por las cortes tan en pugna con el principio clásico en la doctrina angloamericana, como en la española del amigable componedor, y con nuestras decisiones anteriores a la aprobación de la Ley 376, preferible es conocer cuál ha sido la verdadera intención legislativa más que descansar en una máxima de interpretación. De haberse intentado ciertamente por el legislador que los laudos de arbitraje queden sujetos a revisión en su fondo por errores de apreciación de los hechos y del derecho envueltos en la disputa, esa sería la norma a implantarse por este Tribunal, no importa cuán apartada estuviera de la filosofía y de los propósitos mismos de una sumisión a arbitraje.

La Ley 376 autoriza y regula de manera comprensiva el convenio de arbitraje comercial y dispone la forma de hacer cumplir dichos convenios por las cortes. Excluyó, al igual que otros estatutos similares, el arbitraje obrero que se seguiría gobernando por la legislación obrero-patronal. El estatuto está calcado sustancialmente en disposiciones de la legislación sobre arbitraje de California y leyes similares de otros estados, en los procedimientos de Nueva York y en la Ley de Arbitraje de Estados Unidos. Los artículos 22 y 23, únicos que permiten la intervención judicial para revocar, y para modificar o corregir un laudo, son una réplica casi literal de las secciones 1462 y 1462-a de Nueva York; 1288 y 1289 de California y las secciones 10 y 11 de la ley federal (escolio 6 ante). (⁷) Nuestra versión en castellano del inciso

(⁷) El inciso (c) de la sección 1462 de Nueva York, 1288 de California y 10 de la ley federal son idénticos: "Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." (California dice misbehaviors).

(c) no usó una traducción literal de las palabras *"misconduct"* y *"misbehavior"*, pero evidentemente el Legislador no alteró el sentido de dicho inciso al adoptarlo. La legislación de origen expresa en términos de mala conducta o conducta impropia (*"misconduct"*), que da lugar a la revocación del laudo, el que los árbitros *rehusen* posponer la vista habiendo suficiente motivo para ello, o que *rehusen* oir prueba pertinente y material a la controversia. Esa misma situación la versión nuestra la expresa en términos de *error:* cuando "actuaren erróneamente al rehusar" . . . Webster da los vocablos *"misconduct"* y *"misbehavior"* como sinónimos—Black's Law Dictionary, IV Ed.—y así se usan en la versión inglesa del inciso.(8) No podría decirse, en ausencia de signos más claros demostrativos de una intención específica distinta del legislador, que igual expresión en términos de error usada más adelante en relación con el inglés *"misbehavior"*, sinónimo de *"misconduct"*; o cuando "incurrieren en cualquier *error* que perjudique" . . . se usó en un significado distinto al que tiene en la legislación de donde se tomó la misma y en su jurisprudencia, al extremo de quererse incluir cualquier error de los árbitros en la apreciación de los hechos y de las normas de derecho que un tribunal aplicaría a la controversia.

Si tal hubiera sido la intención legislativa, constituyendo ello una desviación tan radical de la legislación de origen y de su jurisprudencia interpretativa no ignorada por el legislador, nuestro estatuto hubiera incluido disposiciones más explícitas en cuanto a que el laudo debía ser conforme al derecho aplicable, como se disponía en la Ley de Enjuiciamiento Civil española en cuanto a los árbitros, o como ocurriría bajo una disposición a tal efecto en el convenio de

---

(8)"Guilty of misconduct . . . *or of any other misbehavior.*"

sumisión en el arbitraje angloamericano, y hubiera provisto además lo necesario para la adecuada revisión en su fondo de tales errores.(⁹)

De acuerdo con el artículo 21 de la Ley 376 no se precisa de la confirmación judicial para la validez y efectividad de un laudo de otro modo válido, y de pedirse su confirmación, el tribunal accederá a ella a menos que lo revoque, modifique o corrija por los motivos de los artículos 22 y 23. Ninguna otra intervención judicial permite la ley contra el laudo en sí. Según la jurisprudencia sentada interpretando disposiciones similares de la legislación en la cual están calcados nuestros procedimientos, aparte del requisito de que el laudo se dará por escrito y bajo sus firmas o la de una mayoría de ellos (art. 20), los árbitros no vienen obligados a hacer conclusiones de hecho ni de derecho, ni a explicar las razones

---

(⁹)En el artículo 4 de la ley que regula los arbitrajes de Derecho Privado de 22 de diciembre de 1953, que suplantó las disposiciones sobre arbitraje de la Ley de Enjuiciamiento Civil de 1881—Medina y Marañón, *Leyes Civiles de España*, 1958—se dispone que sólo existirá un tipo de arbitraje, ya deban fallar los árbitros *con arreglo a derecho*, ya solamente *con sujeción a su saber y entender*, dejando a las partes en la escritura de compromiso (más parecida a la institución angloamericana) en libertad de optar por una u otra de estas soluciones. Si nada dijeren, se entenderá que optan por uno de derecho. También, los artículos 17, 20, 27, 28—disponiendo que en el arbitraje de derecho se dará contra el laudo recurso de casación para el Tribunal Supremo por infracción de ley o quebrantamiento de forma; artículo 29—en el arbitraje de equidad no hay que guardar las formas legales ni ajustarse a derecho en cuanto al fondo, dirimiéndose el conflicto según el mejor saber y entender. En tal caso—art. 30—sólo cabe recurso de nulidad ante el Tribunal Supremo por los motivos del artículo 1691(3)—escolio 6 ante—y de los artículos 1774 a 1780 L.E.C. Como podrá verse, si las partes no optan porque el laudo sea conforme a derecho no pueden obtener, al igual que en el arbitraje angloamericano, la revisión judicial del laudo en su fondo. Una convincente expresión del papel importante que en los tiempos modernos de complejos mecanismos juega la institución del arbitraje como un medio social conveniente para dirimir conflictos e intereses en choque sin acudir al poder coercitivo de los tribunales, la tenemos, explicando la nueva legislación, en la exposición que antecede a la publicación de la Ley de 1953— Enciclopedia Jurídica Española, Apéndice, 1953, pág. 105—en donde se vierten conceptos coincidentes con expresiones de las cortes americanas en cuanto a lo conveniente de alentar tales procedimientos y hacer valer los laudos arbitrales como una política pública deseable.

de su fallo, ni vienen obligados a sustanciar la prueba bajo juramento, ni a tomar la misma por escrito y hacer un récord; deciden la pertinencia de la prueba ofrecida y la aceptación de la misma *sin tener que ajustarse a las reglas de evidencia* (art. 17); y siendo los árbitros de ordinario personas experimentadas en las materias que les son sometidas a su consideración, ellos pueden formar juicio y fallar haciendo uso también de sus conocimientos personales y experiencias sobre dichas materias. Véase casos citados anteriormente y *Hudson Lumber Co.* v. *United States Plywood Corp.*, (1954), 269 P.2d 93, 95–96; *Sampson Motors* v. *Roland*, (1953), 263 P.2d 445, 447; *Sapp* v. *Barenfeld*, (1949), 212 P.2d 233, 238–239; *Application of Spectrum Fabrics Corp.*, (1955), 139 N.Y.S.2d 612, 617; *Avila Fabric* v. *Excel Garment*, (1954), 135 N.Y.S.2d 182, 183; *Calvine Cotton Mills* v. *Textile Workers Union*, (1953), 79 S.E.2d 181, 183; *Anotación*, 154 A.L.R. 1210.

En tales circunstancias, por razones prácticas cuando menos de viabilidad, no nos parece que en estos casos deseó el legislador que el Tribunal Superior revisara los laudos de arbitraje en su fondo o méritos sobre cualquier error de apreciación o de interpretación de los hechos y de la ley sin a la vez proveer los medios adecuados para una consciente determinación por el tribunal de la comisión o no de tales errores a la luz de los hechos envueltos y del derecho tal como la Sala sentenciadora lo estimaría aplicable, a menos que como cuestión de realidad se tramitara un juicio *de novo* en el Tribunal Superior lo cual claramente no se concibe en la Ley 376. De acuerdo con lo antes expresado debemos concluir que la Ley 376 de 1951 no autorizó la revisión judicial en su fondo o méritos de un laudo de arbitraje por otra parte emitido con facultad para ello, y contra dicho laudo sólo puede decretarse su revocación, y su modificación o corrección, cuando acontecieren los motivos estatuídos en los artículos 22 y 23 de la referida ley. La aprobación de la Ley 376 no dejó por lo

tanto sin efecto nuestras decisiones de antes de la misma que impedían la revisión judicial en los méritos de un laudo.

■ Los cuatro errores siguientes que la recurrente imputa a la Sala sentenciadora: (a) al decidir que los árbitros no se excedieron en su jurisdicción al rendir el laudo; (b) al sostener que la decisión de los árbitros no es contraria a la política pública; (c) al hallar como cuestión de hecho que la controversia entre los árbitros giraba alrededor de qué cantidad de dinero adicional al precio del contrato venía obligada a pagar la recurrente al contratista, y (d) al decidir que el pacto de sumisión entre las partes no especificó que las decisiones de los árbitros debían hacerse conforme a derecho, no fueron cometidos. Según la recurrente discute estos errores los mismos entran en la consideración del laudo en su fondo o méritos, y envuelven cuestiones de *hecho* en cuanto a la interpretación del contrato y de la prueba que recibieron los árbitros no revisable judicialmente según ya hemos expresado al resolver el primer error.

■ Independientemente de lo expuesto hemos examinado el laudo detenidamente a la luz de la controversia sometida a los árbitros y de los motivos de impugnación ante la Sala sentenciadora, de la prueba que ellos tuvieron ante sí y de las disposiciones del artículo 22 de la Ley, y no existe base en el récord para concluir que el laudo emitido lo fue en violación de dichas disposiciones, o en manifiesta desatención o ignorancia de la ley en contraste con su interpretación, según se dijo en el caso de *Wilco* v. *Swan*, supra; o como han expresado otros tribunales, que el laudo sea de su faz tan palpable y manifiestamente erróneo en la aplicación de las sanas normas que deben regir la disputa que ello equivalga en realidad a la perpetración de un fraude hacia una de las partes que de buena fe se sometió al buen juicio de los árbitros. *Cowey* v. *Arrow Coach Lines*, (1956), 288 S.W. 2d 192, 196; *Sampson Motors* v. *Roland*, supra, pág. 447; *Popcorn Equipment Co.* v. *Page*, (1949), 207 P.2d 647, 649; *Fine Foods*,

*Inc.* v. *Office Employees International Union,* (1959), 185 N.Y.S.2d 1021, 1022–1023; *Amicizia Societa Nav.* v. *Chilean Nitrate and Iodine S. Corp.,* supra, pág. 808–809; *Miller, Inc.* v. *Wilmington Housing Authority,* (1959), 179 F. Supp. 199, 202.

■ La cuestión que con mayor énfasis discute ante nos la recurrente es que los árbitros interpretaron mal el contrato al conceder la compensación adicional por relleno, porque según sostiene cambiaron la naturaleza del mismo de uno por precio alzado a uno por precio unitario, y que esto es en contra de la política pública seguida por la Autoridad en este tipo de contratos para la construcción de caseríos. Esa fue también su principal contención ante los árbitros. El récord no le da la razón a la recurrente. De acuerdo con el apartado (*b*) de la cláusula 17 del contrato transcrita en los autos, fueron precisamente aquellas disputas que surgieran relativas a la concesión de reclamaciones, o al monto de reclamaciones, que envolvieran un *cambio en el precio del contrato,* las que se reservaron para ser decididas por el Director Ejecutivo sujeto a arbitraje. Las demás disputas, unas se decidían exclusivamente por la Autoridad siendo la decisión final y obligatoria, y otras exclusivamente por el Director Ejecutivo.

A solicitud del contratista quien encontró que los planos del contrato no respondían a la situación verdadera sobre el terreno, la Autoridad hizo nuevos planos topográficos como consecuencia de lo cual emitió la Orden de Cambio núm. 13 ordenando al contratista realizar trabajo adicional de relleno. La propia Autoridad alteró el precio del contrato a tenor de dicha orden de cambio y lo aumentó a base del precio preconvenido de 80 centavos por cada yarda cúbica. La disputa surgió por la disparidad de criterio entre las partes en cuanto al monto del aumento a base de la cantidad de relleno adicional necesario, y no en cuanto a si el precio original del contrato podía o no ser cambiado, sosteniendo el contratista

que en la orden de cambio la Autoridad había considerado sólo el relleno de una porción del área y no de toda el área, y que existían condiciones topográficas distintas a las que reflejaban los planos originales y ello envolvía un cambio en las condiciones del contrato.

De acuerdo con la evidencia que tuvieron ante sí los árbitros, ellos concluyeron como cuestión de hecho que al someter el contrato a subasta la Autoridad había hecho con toda exactitud, a los fines de informar el costo del mismo, un estimado del relleno a ser colocado, estimado éste que la Autoridad había entregado al contratista; que la Autoridad admitió luego que la topografía contenía errores y ordenó nuevos estudios topográficos, y que aun cuando el contrato era por precio alzado el hecho cierto era que durante su ejecución se revisaron las partidas de relleno por deficiencias o errores del plano topográfico que fuera preparado por la Autoridad, lo cual había sido admitido por ella al extender la Orden de Cambio núm. 13. Concluyeron también como cuestión de hecho que al contratista no le era posible determinar el relleno adicional necesario para comprimir el terreno existente y que quien hubiera podido determinar esa situación era la Autoridad por los estudios practicados al efecto. (Conclusiones Apéndice A.) A tenor del récord las conclusiones de los árbitros no serían impugnables ni aun en el caso de conclusiones de una corte inferior.[10] La controversia resuelta por los árbitros cae claramente dentro de lo que se contempló en la cláusula 17 del contrato que podía resultar en un cambio de precio, sin que por ello el laudo cambiara la naturaleza del contrato de uno por precio alzado a uno por precio unitario en violación de una política pública relativa a este tipo de contratos.

---

[10] El artículo 1485 del Código Civil no permite al contratista de una obra por ajuste alzado pedir aumento del precio aunque se aumentare el de los jornales y materiales, *pero puede hacerlo cuando se haya hecho algún cambio en el plano que produzca aumento de obra, si ha dado su autorización el propietario.* Así ocurrió en este caso.

En el último error que discute la recurrente trata de impugnar la sumisión en sí, alegando que el Director Ejecutivo carecía de facultad para someter esta controversia a arbitraje. El planteamiento fue hecho por primera vez al solicitarse del Tribunal Superior la reconsideración de la sentencia confirmando el laudo, y la Sala resolvió que la Autoridad se había sometido voluntariamente a la jurisdicción de los árbitros. Uno de los fundamentos es que el contratista no hizo uso del derecho a solicitar arbitraje dentro del término estipulado en el contrato, y se arguye que la reclamación se le denegó el 9 de noviembre de 1953 y no fue hasta el 13 de enero de 1954, pasado ya el término de 10 días mencionado en el apartado (*b*) de la cláusula 17 del contrato, que el contratista solicitó arbitraje. Efectivamente, el récord demuestra que el 9 de noviembre de 1953 el Director Ejecutivo envió una comunicación a Zequeira ·denegando su reclamación de pago adicional por relleno. Pero también, después de esa comunicación hubo conversaciones adicionales entre las partes sobre la disputa; el Director Ejecutivo indicó al contratista la conveniencia de que los ingenieros de la Foundation Engineering Co. comparecieran ante el Director a los fines de discutir el informe sometido por dicha firma que sostenía la posición del contratista, y con vista de ello, en carta del 1ro. de diciembre de 1953 éste solicitó del Director que fijara fecha y hora para dicha entrevista a ver si se podía llegar a una decisión satisfactoria para ambas partes. En la comunicación que en 4 de enero de 1954 el Director Ejecutivo envió al contratista hace mención a una conferencia celebrada en 4 de diciembre, y a lo expresado por él en dicha conferencia al efecto de que no existía fundamento para la reclamación. Ante esos hechos es claro que la reclamación quedó finalmente denegada en 4 de enero de 1954 y la solicitud de arbitraje de 13 de enero estuvo en tiempo. Así pareció entenderlo el propio Director.

■ El otro fundamento de la recurrente impugnando la facultad del Director Ejecutivo para someter la disputa a arbitraje se basa en el hecho ya resuelto al discutirse los errores anteriores de que la sumisión a arbitraje de la disputa aquí envuelta por parte del Director Ejecutivo era en violación del contrato, por envolver la misma un cambio en su naturaleza de uno por precio alzado a uno por precio unitario. Realmente la Autoridad no discute que la controversia no pudiera someterse a los árbitros, o que la sumisión fuera contraria a la ley, pero sostiene que era ella, y no su Director Ejecutivo, quien tenía facultad para hacerlo.

Sin penetrar ahora por innecesario en el campo de las particulares esferas de acción de la Autoridad y de su Director Ejecutivo, el récord demuestra que la Autoridad no sólo se sometió a la jurisdicción de los árbitros compareciendo ante ellos asistida de sus abogados, haciendo sus planteamientos y sometiendo la controversia a la decisión de aquéllos, sino que en momento alguno antes de rendirse el laudo ella invocó la intervención del Tribunal Superior impugnando la sumisión hecha por el Director ni solicitó del tribunal la paralización de los procedimientos de arbitraje, como debió hacerlo de acuerdo con el procedimiento provisto en la propia Ley 376. Al impugnar el primer laudo rendido que fue revocado, la Autoridad tampoco levantó esta cuestión, aceptando que el asunto volviera a arbitraje. La Autoridad renunció a cualquier contención de esta naturaleza al someterse a los procedimientos, y el planteamiento hecho por primera vez después de rendido el laudo fue tardío, a menos que se hubiera tratado de la situación provista en el inciso (e) del artículo 22. Cf: *Brotherton, Inc.* v. *Kreillsheimer,* (1951), 83 A.2d 707, 709; *In re General Dry Cleaners,* (1947), 75 N.Y.S.2d 615, 619; *In re Nadalen Full Fashion, etc.,* (1954), 134 N.Y.S.2d 612, 614–615; *Sapp* v. *Borenfeld,* (1949), supra.

*Por los fundamentos de esta opinión se anulará el auto de certiorari expedido y quedará en todo su efecto la sentencia recurrida confirmando el laudo arbitral. Los autos originales serán devueltos para ulteriores procedimientos no incompatibles con lo aquí dispuesto.*

## APÉNDICE A

## "CONCLUSIONES

1—Que la Autoridad informó al Contratista, por documento que le fuere suministrado, 'Schedule of Amounts for Contract Payments' un desglose de unidades de obra y trabajo del contrato en que aparecían rellenos a colocarse en la parcela y calles en la cantidad de 70,237 y 16,596 metros cúbicos respectivamente. Que tales cantidades llevadas hasta la exactitud de la última cifra, fueron estimadas por la Autoridad para determinar el coste de este relleno, así como de otras partidas del contrato y el coste de todo el contrato en sí el cual le servía de base a la Autoridad para el anuncio en subasta y determinar si puede o no adjudicar la obra. Entendemos por tanto que este estimado se realizó por la Autoridad con toda exactitud para los fines de informarse del coste de la obra a ejecutarse. De hecho a nuestro juicio constituye un estimado de obra de trabajo y de gastos.

2—Que aun cuando el contratista estimó los costes de estas partidas, el hecho cierto es que tales partidas y sus cantidades fueron estimadas por la Autoridad y entregadas al Contratista. No fue el Contratista por tanto el que preparara el desglose de unidades de obra y trabajo.

3—Que a no ser por que el Contratista pudo informarse con alguna exactitud de la cantidad de relleno que colocaba a través de la anotación de los trucks que suministraban las tierras, este hubiese estado impedido de poder determinar el relleno colocado en exceso, afirmando la existencia de errores en el Mapa Topográfico que le fuera suministrado por la Autoridad.

4—Que la Autoridad admitió que la topografía contenía errores al ordenar la práctica de nuevos estudios topográficos y remitir al contratista la Orden de Cambio núm. 13 de fecha 4 de diciembre de 1950 en la que no solamente se corrigió aumentando la cantidad de relleno a colocarse, sino que se le disminuyó la cantidad de excavaciones. Tales modificaciones aumentaban

las partidas que fueron estimadas por la Autoridad para su determinación del coste de estos trabajos y del contrato en su totalidad.

5—Que aun cuando el contrato era por precio alzado el hecho cierto es que durante su ejecución hubo necesidad de revisar las partidas de relleno por deficiencias o errores del plano topográfico que fuera preparado por la Autoridad admitiendo la Autoridad este hecho al extender la Orden de Cambio núm. 13.

6—Que al Contratista protestar de la Orden de Cambio por contener un aumento de relleno por debajo de la cantidad que el Contratista reclamaba, la Autoridad le indicó que hiciera revisar a cargo suyo la topografía de la parcela. Este trabajo le fue encomendado a la Foundation Engineering Corporation. Copia del estudio le fue suministrado a la Autoridad para su estudio y consideración tal y como lo fuere solicitado.

7—Que la alegación de la Autoridad de que al Contratista le correspondía hacer el relleno hasta llegar a determinada elevación, sin previa determinación del volumen de relleno, a nuestro juicio está fuera de nuestra consideración, por cuanto para eso la Autoridad suministró un plano topográfico y un desglose de partidas de relleno.

8—Que al Contratista no le era posible determinar el relleno adicional que hubiera sido necesario para comprimir el terreno existente y que quien hubiera podido determinar esa situación por los estudios practicados al efecto era la propia Autoridad.

9—Que la cantidad de relleno colocado, según el estudio de la Foundation Engineering Corporation monta a 120,603 metros cúbicos.

10—Que el Contratista por tanto colocó 33,770 metros cúbicos de relleno en exceso de la cantidad estimada y estipulada por la Autoridad. De esta cantidad debe deducirse 3,550 metros cúbicos de relleno según aparece del estudio de la Foundation Engineering Corporation que fueron colocados bajo los edificios hasta la rasante final de la parcela, más 1,759.80 metros cúbicos que fueron acreditados a la Orden de Cambio núm. 13."