TEÓFILO COLÓN MOLINARY, MARCIAL MALDONADO MELÉNDEZ y JESÚS GARCÍA FALÚ, peticionarios y recurrentes, *v.* AU-TORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS DE PUERTO RICO, demandada y recurrida.

*Número:* O-72-274        *Resuelto:* 19 de diciembre de 1974

*Demetrio Fernández,* abogado de los peticionarios; *Ramón Cancio* y *José A. Sabater,* abogados de la Autoridad de Acueductos y Alcantarillados.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Este caso plantea novedosas interrogantes en el dinámico campo de las relaciones obrero-patronales en el área poco adjudicada del servicio público, en particular sobre la validez y alcance de un laudo de *arbitraje compulsorio legis-*

*lativo* ([1]) rendido en virtud de un convenio colectivo existente entre la Unión de Empleados de la Autoridad de Acueductos y Alcantarillados de P.R. y esta última instrumentalidad, en lo sucesivo denominada Autoridad.

Ante la negativa de la Autoridad de acatar dicho laudo por el fundamento de ser nulo, los peticionarios Teófilo Colón Molinary, Marcial Maldonado Meléndez y Jesús García Falú —al amparo del Art. 14 de la Ley Núm. 142 de 30 de junio de 1961 (29 L.P.R.A. sec. 494) ([2])—oportunamente acudieron ante este Tribunal solicitando se pusiera en vigor.

Los hechos relevantes e incontrovertidos que dan margen a la contienda según expuestos en el extenso, minucioso y persuasivo laudo se retrotraen al período comprendido entre el 20 de octubre y 2 de noviembre de 1970, en que los peticionarios como líderes, conjuntamente con otros 100 ó 150 empleados de las oficinas centrales de la Autoridad, propiciaron y participaron en una huelga con el objetivo de demostrar que la agrupación obrera que ellos representaban gozaba del respaldo mayoritario de los empleados de oficina de la instrumentalidad.

Por tales actividades, el 2 de noviembre de 1970 los peticionarios fueron destituidos sumariamente por el Director Ejecutivo de la demandada luego de considerar el historial y expediente personal de cada uno de ellos.

En virtud de las disposiciones del Convenio Colectivo vigente, los peticionarios apelaron la determinación de des-

---

([1]) Utilizamos el concepto "arbitraje compulsorio legislativo" para diferenciar la situación en que el mecanismo de arbitraje es de naturaleza obligatoria por así acordarlo las partes, de cuando su carácter imperativo es por razón de una ley especial. El convenio fue suscrito en 5 de junio de 1970 y estuvo vigente desde el 1ro. de enero de 1970 hasta el 31 de diciembre de 1971.

([2]) Dispone en lo pertinente: "Los laudos de arbitraje emitidos de acuerdo con las disposiciones de esta ley podrán ser puestos en vigor por el Tribunal Supremo de Puerto Rico, bien por acción legal entablada por cualquiera de las partes o a través del procedimiento establecido en la Ley de Relaciones del Trabajo de Puerto Rico en su Art. 9, Sección 2, Inciso (c)."

titución sumaria para ante el Comité de Querellas, habiendo las partes acordado el 29 de abril de 1971 que el asunto fuera ventilado exclusivamente ante su Presidente Lcdo. Joaquín Gallart Mendía.

Previo desfile de prueba de carácter testifical y documental—asistidas las partes de sus respectivos abogados—el 24 de mayo de 1972 el árbitro emitió su laudo, que en la parte dispositiva expresa lo siguiente:

*"Deseamos en este punto expresar claramente que a nuestro juicio hay base suficiente en la prueba ofrecida y admitida en estos casos para sostener la destitución sumaria que se decretó contra los cuatro querellantes envueltos en los mismos.*

Sin embargo, *tomando en conjunto tanto las conclusiones de hecho como las consideraciones legales y de otro orden que se dejan anteriormente expresadas, creemos que se cumplen mejor los fines de la ley y del convenio colectivo que rige las relaciones entre las partes, sustituyendo la acción de despido decretada en tres de los casos por una sanción de suspensión de empleo y sueldo por un período de un año.* Esos tres casos son los de Teófilo Colón Molinary, Marcial Maldonado Meléndez y Jesús García Falú.

Se declara con lugar la moción de desestimación interpuesta en el caso de Luis H. Lebrón Escobar y en la alternativa, o sea, si tuviéramos jurisdicción para entender en su apelación a la cual renunció válidamente al firmar la estipulación del 5 de noviembre de 1969, *entendemos que su destitución estuvo justificada y que su historial personal no amerita que se le imponga una sanción menos severa como lo estamos haciendo en los casos de sus otros tres compañeros querellantes.*

Se dispone, pues, que los señores Teófilo Colón Molinary, Marcial Maldonado Meléndez y Jesús García Falú sean reinstalados en las posiciones que desempeñaban en noviembre 2 de 1970, fecha en que se decretó su destitución.

Como a la fecha en que este laudo se emite ha transcurrido más de un año y medio de haber sido despedidos se le pagará a dichos querellantes, con carácter retroactivo, *el tiempo transcurrido desde el 3 de noviembre de 1971 hasta la fecha en que sean restituidos a sus respectivos empleos."* (Énfasis suplido.)

## I

Para sostener la nulidad del laudo, la Autoridad parte de la premisa que el árbitro carecía de facultad para emitirlo por exceder los términos del acuerdo de sumisión general consignado en el Art. VII, pár. 21, que reza así:

"De acuerdo con la prueba que desfile ante el Comité de Querellas en los casos de suspensión de empleo y sueldo o despido, el Comité, (1) podrá exonerar totalmente al empleado en cuyo caso ordenará su reposición y el pago completo de los salarios dejados de recibir mientras estuvo despedido o suspendido; (2) podrá sostener totalmente la acción tomada por la Autoridad, o (3) podrá modificar dicha acción ordenando la reposición con paga parcial o sin paga."

Aduce que la referida disposición limitaba el poder del árbitro a dejar sin efecto el despido y ordenar la reposición de los peticionarios, ya bien con paga o sin paga, únicamente si la prueba ofrecida así lo justificaba, y que, habiendo concluido éste que la evidencia ofrecida y admitida era suficiente para apoyar la destitución sumaria de los peticionarios, tenía el deber de sostener la acción de despido y no sustituirla por otras sanciones.[3] Para robustecer su posición, la Autoridad expone además, que el laudo es contrario a la política pública de la Ley Núm. 142 de 30 de junio de 1961. A tal efecto, destaca la aplicabilidad de los principios esbozados por este Tribunal en materia de arbitraje en el sentido de que un laudo se rige primeramente por la ley especial y el convenio colectivo, y sólo supletoriamente por

---

[3] Haciendo constar que ello era sin perjuicio ni menoscabo de su impugnación al laudo, el 28 de septiembre de 1972 la demandada comunicó a este Tribunal que el 13 de septiembre de 1972 decidió reponer a los peticionarios Teófilo Colón Molinary y Marcial Maldonado Meléndez en sus empleos a partir del 1ro. de octubre de 1972, ello sin paga atrasada. Conforme la comunicación cursada por el Director Ejecutivo al efecto, la reposición se hizo tomando en consideración los años de servicio que estos dos peticionarios llevaban trabajando para la Autoridad cuando fueron despedidos, a saber 25 y 15 años respectivamente. El peticionario Jesús García Falú continúa destituido.

los principios generales de derecho aplicables al arbitraje obrero-patronal, *Junta Rel. Trabajo* v. *Valencia Baxt*, 86 D.P.R. 282 (1962); y de que en la determinación de la jurisdicción del árbitro, los contratos de arbitraje serán cuidadosamente interpretados, *Junta Relaciones del Trabajo* v. *N.Y. & P.R. S/S Co.*, 69 D.P.R. 782 (1949).

Contra esta contención los peticionarios señalan y argumentan lo siguiente: la facultad del árbitro para variar la pena a tenor con el convenio colectivo y la doctrina jurisprudencial vigente; que la modificación de la sanción fue de conformidad con la prueba; que el árbitro cumplió con las exigencias impuestas por ley; y que el laudo no es contrario a la política pública. De manera colateral proponen la tesis de que la Ley Núm. 142 antes indicada, es inconstitucional por privar a los peticionarios del derecho a la huelga consagrado en la Carta de Derechos de nuestra ley suprema, a la par que violenta la cláusula constitucional de igual protección de las leyes.

Reiteran su petición de que otorguemos virtualidad al laudo y nos solicitan, como remedios adicionales compatibles con tal decisión, les reconozcamos daños líquidos consistentes de una suma igual a la adeudada en concepto de penalidad, honorarios de abogado e intereses legales desde la fecha del laudo hasta su satisfacción.

## II

El Poder Legislativo con el endoso del Ejecutivo, el 30 de junio de 1961 aprobó la Ley Núm. 142 reconociendo y garantizando a los empleados de la instrumentalidad demandada el derecho a la negociación colectiva. Se condicionó a la vez la concesión de tal derecho, estableciéndose en la ley—tanto en la etapa de la negociación como la de administración del convenio colectivo—un procedimiento de arbitraje de carácter compulsorio. A tal efecto, se prohibió el uso de la huelga y de varias modalidades de actividades concertadas que ten-

dieran o tuvieran la finalidad de paralizar los servicios de la demandada. Por la razón que más adelante se expone, no es necesario expresar opinión en el caso que nos ocupa, sobre la validez o nulidad—total o parcial—de esta ley.

Al imponer la obligación de que las partes incluyeran en sus convenios colectivos una cláusula sobre solución de disputas, quejas y agravios a través de un Comité de Querellas, el legislador dispuso los siguientes criterios:

"Artículo 10.—El Comité de Querellas hará por escrito conclusiones de hecho y rendirá el correspondiente laudo sobre las cuestiones planteadas en la controversia. La decisión será por mayoría y *será final y obligatoria para las partes*.

Artículo 11.—Cuando la disputa gire únicamente en torno a la interpretación o aplicación de un convenio colectivo, el Comité de Querellas sólo tendrá autoridad para determinar sobre la interpretación o aplicación correcta de las cláusulas en disputa.

Artículo 12.—El Comité de Querellas *no podrá emitir ninguna decisión que infrinja los derechos de la autoridad de administrar y dirigir su negocio* y que interfiera con la administración interna de cualquiera unión obrera, *excepto cuando tales derechos de la Autoridad y la unión obrera queden limitados por cualquier convenio colectivo en vigor al emitirse el laudo.*" (29 L.P.R.A. secs. 490, 491 y 492.) (Énfasis suplido.)

Respecto al aspecto de medidas disciplinarias la aludida pieza legislativa consignó:

"Artículo 16.—Tanto las instrumentalidades como la Unión tienen el deber ineludible de discutir y llegar a un acuerdo sobre su convenio colectivo y no podrán las instrumentalidades, la Unión, *cualquier empleado o grupo de empleados interrumpir o disminuir o intentar interrumpir o disminuir los servicios que dichas instrumentalidades prestan al público con motivo de la negociación, concertación, interpretación o aplicación de un convenio colectivo o como resultado de cualquier disputa obrero patronal.* Las partes vendrán obligadas a someter a un árbitro. . . ."

"Artículo 17.—Será ilegal que la Autoridad *despida, suspenda, reduzca el salario* o en cualquier otra forma discrimine contra cualquiera de sus empleados para burlar los propósitos de esta

ley *pero podrá tomar las medidas disciplinarias que considere necesarias en relación con los empleados que violen lo dispuesto en el Artículo 16 de esta ley. Dichas medidas disciplinarias podrán ser apeladas por el o los perjudicados o por la Unión para ante el Comité de Querellas y la apelación se tramitará y resolverá como una disputa ordinaria."* (Énfasis suplido.)

█ La lectura de las transcritas disposiciones de ley pone de manifiesto que la Asamblea Legislativa confirió claramente al Comité de Querellas instituido en la misma, potestad para dirimir y resolver las controversias que surgieran por determinaciones de la Autoridad despidiendo, suspendiendo o reduciendo el salario o discriminando contra cualquier empleado, aun cuando tales medidas disciplinarias estuvieran basadas en actuaciones serias de los empleados tendentes a disminuir o interrumpir los servicios que tal instrumentalidad presta. De especial significado es el lenguaje del Art. 17, que *in fine* dispone que las medidas disciplinarias podrán ser apeladas ante el Comité, y que tal apelación ". . . *se tramitará y resolverá como una disputa ordinaria."* (Énfasis suplido.)

A tono con la ley, el Convenio Colectivo, en su Art. VII denominado "Procedimiento para Atender y Resolver Controversias", fijó unas etapas y procedimientos de naturaleza administrativa y ante el Comité de Querellas para dilucidar las disputas que surgieran entre las partes. En lo concerniente al caso de autos, los párrafos 17, 18 y 21 delinearon el trámite para ventilar casos de separación o suspensión de empleo y sueldo, otorgándole facultad al Comité de Querellas para intervenir y decidir los mismos. Rezan así:

"17—Se entenderá por queja o querella cualquier controversia, disputa o diferencia que surja entre la Unión y la Autoridad que envuelva la interpretación o la aplicación de este Convenio, . . . *o sobre el despido, la suspensión o cualquier otra acción disciplinaria tomada en relación con cualquier empleado* . . . .

18—(a) .    .    .    .    .    .    .    .

(b) No obstante lo dispuesto en el párrafo anterior [inciso (a)], la Autoridad podrá suspender de empleo o destituir suma-

ria o perentoriamente a un empleado (a) cuando éste haya sido suspendido de empleo y sueldo durante. . . .

21—*De acuerdo con la prueba* que desfile ante el Comité de Querellas *en los casos de suspensión de empleo y sueldo o de despido,* el Comité (1) *podrá* exonerar *totalmente* al empleado en cuyo caso ordenará su reposición y el pago completo de los salarios dejados de recibir mientras estuvo despedido o suspendido; (2) *podrá* sostener totalmente la acción tomada por la Autoridad, o (3) *podrá modificar dicha acción ordenando la reposición con paga parcial o sin paga."* (Énfasis suplido.)

■ Del análisis global de estos párrafos del Convenio Colectivo, en especial del número 21, concluimos que el Comité tenía en los casos de suspensión y despido el poder discrecional—con sujeción a la prueba—de exoneración, confirmación o modificación de la sanción disciplinaria impuesta, con la facultad de disponer aquellos remedios económicos expresamente señalados en el Convenio correlativos a la decisión adoptada. El ejercicio de tal potestad es uno de naturaleza sustantiva, consustancial con los fines y propósitos de la ley que establece el arbitraje compulsorio legislativo y dispone en situaciones como la presente, que sean resueltas ". . . como una disputa ordinaria".

La frase "De acuerdo con la prueba que desfile ante el Comité" recoge una norma de carácter procesal cuyo alcance y significado es el de limitar, que en el proceso cuasi-judicial decisional del Comité, sólo se considere la prueba y evidencia aportada durante la ventilación de la controversia. No tiene el efecto de privar al Comité de su poder de aquilatar y evaluar la prueba conforme su más sano criterio, y de estimar que la misma demuestra que determinada falta se cometió, confirmar o variar la sanción disciplinaria. La única restricción estriba en que si la prueba refleja y demuestra la certeza y realidad de los hechos que motivaron la acción disciplinaria, el Comité no estará autorizado a dictaminar una

*total exoneración*, aun cuando conserva la facultad de variar o modificar la sanción impuesta por la Autoridad.

En el caso de autos surge diáfanamente claro que el árbitro nutrió su criterio de la prueba sometida—cargos imputados e historial de los peticionarios—al modificar las medidas disciplinarias. (4) El que consignara expresamente en el laudo la existencia de prueba para sostener la destitución sumaria no milita en contra de su decisión, pues subsiguientemente cualificó tal determinación, y a la luz de toda la prueba sostuvo la acción disciplinaria, aunque varió la pena impuesta.

Preciso es señalar que coincidimos con las conclusiones del árbitro de que la Autoridad no violentó ningún precepto constitucional, dentro de la facultad expresa y discrecional que posee, al adoptar medidas disciplinarias distintas a las que en época pasada tomara en otras actividades huelgarias. Tampoco estaba restringida ni obligada a imponer iguales sanciones disciplinarias a todos los participantes de la acción concertada, ya que dependiendo de la seriedad, naturaleza y extensión de la falta en particular cometida y el historial de cada empleado, podía suspender o destituirlo definitiva o parcialmente, o meramente amonestarlo. Así lo reconoce el párrafo 18 (b) del Convenio que enumera lo que obviamente resultan ser faltas o actuaciones serias de los empleados, y de cuyo examen se desprende la existencia—dentro del ámbito de "seriedad"—de algunas faltas de tal naturaleza que justificarían una destitución permanente.

Concluir lo contrario no sólo sería ilógico y en pugna con el principio de equidad de individuación de sanciones, sino que despojaría a la instrumentalidad demandada de las atribuciones que le confiere su ley orgánica, a las cuales obviamente no puede de manera absoluta renunciar. Sec. 3

---

(4) Fischbach, Charles P., *Past Misconduct in Discharge Cases*, 24 *The Arbitration Journal*, págs. 175–183 (1969).

de la Ley Núm. 40 del 1ro. de mayo de 1945, según enmendada. (22 L.P.R.A. sec. 143.)

## III

■ En ausencia de otras disposiciones de ley o de tipo contractual, resolvemos que son de aplicación a este caso las normas sobre arbitraje diseñadas en nuestro desarrollo doctrinal jurisprudencial. Nada hay en la ley especial ni en su historial que nos sugiera, que en nuestra función de poner en vigor un laudo en casos de esta naturaleza, deba prevalecer un enfoque judicial distinto al que hemos articulado en materia de arbitraje voluntario obrero-patronal. El informe Conjunto de las Comisiones de Trabajo y Gobierno Estatal sobre la Ley Núm. 142 tiende a corroborar esta determinación al consignar: "El sistema del Comité de Arbitraje es además el que más se asemeja al procedimiento de quejas y agravios y arbitraje instituido en la mayoría de los convenios colectivos de trabajo privado vigentes en P.R." Vol. 14, Parte III: *Diario de Sesiones;* pág. 1424 (1961).

Corolario de esta conclusión, es innegable la autoridad de un árbitro de variar una sanción disciplinaria si considera que la misma es muy severa y drástica según lo hemos reconocido en *Junta Rel. del Trabajo* v. *Soc. Mario Mercado e Hijos,* 74 D.P.R. 403, 407 (1953); *J.R.T.* v. *Cooperativa Cafeteros,* 89 D.P.R. 498, 503–4 (1963). También tiene vigencia la norma de que un laudo arbitral no puede anularse por meros errores de criterios de ley o de hechos, según expusimos en los casos de *Ríos* v. *Puerto Rico Cement Corp.,* 66 D.P.R. 470, 477–8 (1946); *Junta Relaciones del Trabajo* v. *N.Y. & P.R. S/S Co.,* supra, 800; *Autoridad sobre Hogares* v. *Tribunal Superior,* 82 D.P.R. 344, 353 (1961); *Junta Rel. Trabajo* v. *Orange Crush of P.R.,* 80 D.P.R. 292, 295 (1958); *J.R.T.* v. *Cooperativa Cafeteros,* 89 D.P.R. 498, 502–3 (1963).

Reafirmamos nuestra trayectoria judicial—con mayor razón y justificación en casos de arbitraje compulsorio legis-

lativo—de sancionar tales procedimientos por constituir un medio apropiado y deseable para resolver las disputas obrero-patronales. Abona a esta conclusión razones de economía procesal y de tipo pecuniario, menos tecnicismos, mayor flexibilidad y la experiencia acumulada. *Nazario* v. *Tribunal Superior*, 98 D.P.R. 846 (1970) ; *Pérez* v. *Autoridad Fuentes Fluviales*, 87 D.P.R. 118 (1963) y las autoridades citadas en ambos casos.

Reiteramos la regla de autorrestricción judicial de que este Tribunal no revisará laudos de arbitraje respecto al derecho o ley aplicable, excepto que determinada ley, o las partes—en el acuerdo de sumisión o en el convenio colectivo— exijan que se decida conforme a derecho. *J.R.T.* v. *Sucn. J. Serrallés*, 94 D.P.R. 343, 347 (1967) ; *United Steelworkers* v. *Paula Shoe Co., Inc.*, 93 D.P.R. 661, 667 (1966) ; *J.R.T.* v. *Executive House, Inc.*, 91 D.P.R. 798, 803 (1965) ; *Junta Relaciones del Trabajo* v. *N.Y. & P.R. S/S Co.*, supra, 800; *Junta Relaciones del Trabajo* v. *Escambrón Beach Club*, 70 D.P.R. 46 (1949).

Las únicas excepciones para superar esta norma de abstención judicial son las causas de nulidad de un laudo tradicionalmente reconocidas, a saber: la concurrencia de fraude; existencia de conducta impropia; falta del debido procedimiento; ausencia de jurisdicción; omisión de resolver todas las cuestiones en disputa; y que el laudo impida el mejor desenvolvimiento de las relaciones obrero-patronales o que de algún modo violente la política pública. *J.R.T.* v. *Cooperativa Cafeteros*, supra; *Junta Relaciones del Trabajo* v. *N. Y. & P.R. S/S Co.*, supra; Updegroff & McCoy: *Arbitration of Labor Disputes*, págs. 215–218 (1960). Ausentes las circunstancias apuntadas, seguiremos ceñidos a la norma doctrinal de considerar definitiva y final la decisión de un árbitro, por constituir la regla más sana compatible con la naturaleza inherente del procedimiento de arbitraje laboral.

■ En virtud de los principios jurídicos expuestos, y bajo los hechos específicos del caso de autos, habiendo el árbitro sostenido la acción disciplinaria de la Autoridad—aun cuando modificó su rigor sustituyendo la destitución permanente por una suspensión de un año sin sueldo—fallamos que el laudo es válido.

## IV

Consustancial con la naturaleza similar de un laudo de arbitraje a una sentencia o decreto judicial, (5) y en armonía con lo decidido en *Beauchamp* v. *Dorado Beach Hotel*, 98 D.P.R. 633 (1970) y *J.R.T.* v. *Caribbean Towers, Inc.*, 99 D.P.R. 595 (1971), los peticionarios nos solicitan la imposición de daños líquidos tales como la penalidad de ley, intereses y honorarios de abogado. El laudo arbitral no proveyó nada sobre el particular. Estos apoyan tal petición en la premisa de que ". . . un empleado que tramita su causa de acción a través del arbitraje no puede tener menos derechos que si lo hiciera directamente a través del Tribunal."

Aun cuando coincidimos que la proposición de los peticionarios está en consonancia con nuestra doctrina sobre arbitraje obrero-patronal, y que a tenor con el principio de *Beauchamp*, supra, las penalidades son ". . . una consecuencia inevitable—por ordenarlo así la ley—de la decisión del árbitro", en el caso de autos el pago de una penalidad es improcedente pues la fuente legal de que dimana su imposición no se prolonga a casos como el presente. Sobre el particular, orientador es el siguiente lenguaje:

"Las fuentes de la 'penalidad' civil en los casos de reclamaciones de salarios son el Art. 13 de la Ley Núm. 379 de 15 de mayo de 1948, 29 L.P.R.A. sec. 282, y la sec. 30 (a) de la Ley de Salario Mínimo de 1956, 29 L.P.R.A. sec. 246 (b) (Supl. 1964,

---

(5) En *Ríos* v. *Puerto Rican Cement Corp.*, 66 D.P.R. 470 (1946), señalamos que "Un laudo de arbitraje ocupa una posición muy similar a la de una sentencia o decreto judicial", y en *Junta Relaciones del Trabajo* v. *N.Y. & P.R. S/S Co.*, supra, reconocimos su dual naturaleza.

pág. 175). El Art. 13, que ha conservado en este particular el mismo texto desde su aprobación, dice que "Todo empleado que reciba una compensación menor que la fijada en esta Ley para horas regulares y horas extras de trabajo, tendrá derecho a recobrar de su patrono mediante acción civil las cantidades no pagadas, más una suma igual por concepto de liquidación de daños y perjuicios . . .'; la sec. 30(a) dispone que "Todo obrero o empleado que por su trabajo reciba compensación inferior a la prescrita en esta ley o en un decreto mandatorio, orden o reglamento de la Junta de Salario Mínimo o en un convenio colectivo o en un contrato individual de trabajo tendrá derecho a cobrar mediante acción civil la diferencia adeudada hasta cubrir el importe total de la compensación que le corresponda, más una cantidad igual a la que se le haya dejado de satisfacer, por concepto de compensación adicional. . . ."

Como podrá verse procede la imposición 1—cuando el patrono satisfaga una compensación menor que la fijada para horas regulares y horas extras de trabajo; y, 2—cuando se le pague al empleado una compensación menor a la prescrita en la Ley de Salario Mínimo, en un decreto mandatorio, en un convenio colectivo o en un contrato individual de trabajo. . . .

.    .    .    .    .    .    .    .

Por otro lado, conocida es la regla de que las penalidades no se presumen y que la intención de su imposición debe aparecer claramente, *Wolf* v. *Neckwear Corporation,* 80 D.P.R. 537 (1958); *Cardona* v. *Corte,* 62 D.P.R. 61, 77–78 (1943); *West India Oil Co.* v. *Buscaglia,* 61 D.P.R. 782 (1943); *Am. Railroad Co.* v. *Comisión Industrial,* 61 D.P.R. 314 (1943). *En ausencia de una intención legislativa expresa no podemos por vía de interpretación extender la penalidad a casos que no se encuentran comprendidos específicamente en estas dos disposiciones legales."* *Salgado* v. *Tribunal Superior,* 92 D.P.R. 367, 371–373 (1965). (Énfasis suplido.)

Bajo la tesis jurídica correcta de que las penalidades dispuestas en ley, pactadas en un convenio colectivo o incorporadas en un contrato individual de trabajo, operan *ex-proprio vigore* en un laudo arbitral favorable a un obrero—sin que tales penalidades estén supeditas a que el dictamen sea uno

directo y proveniente del foro judicial—resolvimos *Beauchamp, supra,* que trataba de una reclamación sobre diferencia de salario de acuerdo a un convenio colectivo, propiamente comprendida en la penalidad establecida en la Sec. 30 de la Ley de Salario Mínimo de 1956 (29 L.P.R.A. sec. 246(a)).

Posteriormente, en la opinión *Per Curiam* del caso *Caribbean, supra*—que versaba sobre una reinstalación por un despido modificado por el laudo ya que no estaba totalmente justificado—consignamos el siguiente lenguaje que puede haber dado margen a la súplica de los peticionarios:

> "En el caso de *Beauchamp* v. *Dorado Beach Hotel,* 98 D.P.R. 633, opinión del 12 de febrero de 1970, este Tribunal determinó que corresponde el pago adicional igual a la suma adeudada en concepto de salarios, como conclusión necesaria al laudo del árbitro, por ordenarlo así la Ley de Horas y Salarios, 29 L.P.R.A. sec. 282, que encarna la política pública del país sobre esta materia, y por considerarse esa ley es parte del contrato de trabajo. En el último párrafo de la opinión se estableció el carácter prospectivo de la misma. El laudo de arbitraje en el presente caso se rindió el 29 de enero de 1970, antes de haberse adoptado la doctrina del caso de *Beauchamp* v. *Dorado Beach Hotel, supra,* por lo que no tiene aplicación a este caso. Convenimos con la demandada en que no procede el pago de la penalidad en el presente caso." Pág. 600.

■ Si bien la cita previamente transcrita tiende a sugerir que la penalidad procede en casos de reinstalación por despido, de rigor es aclarar que el mismo queda modificado por los términos de la presente opinión. Concluímos que en ausencia de estatuto, convenio colectivo o contrato particular que así lo reconozca, las penalidades por trabajo de hecho realizado, fijadas en el Art. 13 de la Ley Núm. 379 y la Sec. 30 de la Ley de Salario Mínimo, no se extienden a casos de reposición por despido ya sea en adjudicaciones ante el foro judicial o en procedimientos de arbitraje.

Nada de lo antes expresado debe entenderse como que re-

voca la norma consagrada en *Beauchamp,* la cual hace unas pocas semanas reafirmamos y ampliamos en *J.R.T.* v. *Caribbean Towers, Inc.,* 102 D.P.R. 774 (1974), concediendo doble penalidad, intereses al tipo legal, pago de costas y honorarios de abogado, por tratarse de un laudo basado en una querella de compensación por tiempo doble de trabajo realizado durante ciertos días feriados. Vigorizamos allí nuestra actitud judicial hacia los procedimientos administrativos de arbitraje ante dicho organismo, resolviendo que la doctrina de *Beauchamp* es extensiva a los laudos que la Junta de Relaciones del Trabajo de Puerto Rico emita a partir de la fecha expuesta.

Respecto a honorarios de abogado, los peticionarios descansan ". . . en lo resuelto en el caso de *Beauchamp,* supra, y en las disposiciones de la Ley para Regular la Concesión de Honorarios de Abogado en los casos de Reclamaciones de Trabajadores Contra sus Patronos, Ley Núm. 402 de 12 de mayo de 1950, 32 L.P.R.A. secs. 3114–3117."

■ Aun cuando hemos fallado que no es de aplicación al caso que nos ocupa lo preceptuado en el Art. 13 de la Ley Núm. 379 y en la Sec. 30 de la Ley de Salario Mínimo—y no obstante no ser propiamente una reclamación de una deuda por servicios prestados—la política pública que inspira la legislación sobre honorarios de abogado([6]) y nuestras decisiones al efecto equiparando un laudo arbitral a una adjudicación judicial, nos llevan a concluir, que de ordinario, procede la imposición de honorarios en casos en que el obrero tiene que acudir al foro sustitutivo del judicial a hacer valer sus derechos.

---

([6]) Abona a la anterior conclusión el siguiente lenguaje de la mencionada ley: "En los casos en que la reclamación sea satisfecha extrajudicialmente, las partes, además de cumplir con las disposiciones de ley sobre transacciones, deberán, si no se pusieren de acuerdo sobre los honorarios a ser pagados por el patrono querellado al abogado del trabajador o empleado querellante, someter su determinación a la corte que hubiera tenido jurisdicción sobre el caso." (32 L.P.R.A. sec. 3115.)

De tal resultado no estaría normalmente exenta la Autoridad pues el Art. 2 de la Ley Núm. 402 la considera comprendida en la definición de Patrono.

■ Sin embargo, preciso es destacar que al igual que las acciones ventiladas en el escenario judicial, la cuantía de honorarios a ser impuesta dependerá de la naturaleza del asunto y demás factores y criterios desarrollados en nuestra jurisprudencia, y ello bajo un sano ejercicio discrecional del árbitro.

■ La norma que adoptamos debe tener efectos prospectivos en lo que se refiere a honorarios de abogado en los procedimientos de arbitraje. No es extensiva a situaciones en que un laudo reconoce que el patrono estuvo justificado en imponer medidas disciplinarias—por haberse demostrado la ocurrencia de los hechos que dan margen a la misma—y el dictamen meramente sustituye o varía la severidad de la sanción. *Contrario sensu*, si el laudo exonera totalmente al obrero o empleado, el árbitro conserva la facultad discrecional para fijar honorarios. En armonía con lo dispuesto, en vista de la conclusión expresada en el laudo de que la Autoridad estuvo justificada en suspender a los peticionarios, no procede la condena de honorarios de abogado en dicha etapa como tampoco ante este foro.

■ Consecuencia lógica e inexorable al trazar rumbos paralelos entre un laudo arbitral y un dictamen judicial es el reconocer que proceden intereses legales. Art. 1649 del Código Civil de 1930 (31 L.P.R.A. sec. 4591); Art. 341 vigente del Código de Enjuiciamiento Civil (32 L.P.R.A. sec. 1473). En el caso de autos, los mismos deberán abonarse al interés legal anual *sobre* la cantidad total de salario *regular* dejado de percibir correspondiente al período comprendido entre la fecha en que los peticionarios debieron ser reinstalados, 3 de noviembre de 1971 y la fecha de reins-

talación efectiva, pero computados *a partir* de la fecha del laudo, 24 de mayo de 1972, hasta que sean completamente satisfechos.

## V

No es necesario que anticipadamente nos pronunciemos sobre los méritos del ataque colateral de inconstitucionalidad que los peticionarios hacen del Art. 16 de la Ley Núm. 142 de 30 de junio de 1961 (29 L.P.R.A. sec. 496). *E.L.A.* v. *Aguayo*, 80 D.P.R. 552 (1958).

*Conforme lo expuesto, se dictará sentencia poniendo en vigor el laudo.*

—O—

### RESOLUCION

San Juan, Puerto Rico, a 7 de febrero de 1975

Se enmienda la opinión de este Tribunal emitida el 19 de diciembre de 1974, en su pág. 15, [pág. 155 de este tomo] para eliminar la siguiente frase:

"y que el laudo impida el mejor desenvolvimiento de las relaciones obrero-patronales. . . ."

Eliminada dicha frase, el párrafo deberá decir como sigue:

"Las únicas excepciones para superar esta norma de abstención judicial son las causas de nulidad de un laudo tradicionalmente reconocidas, a saber: la concurrencia de fraude; existencia de conducta impropia; falta del debido procedimiento; ausencia de jurisdicción; omisión de resolver todas las cuestiones en disputa; o que de algún modo violente la política pública, *J.R.T.* v. *Cooperativa de Cafeteros,* supra; *Junta Relaciones del Trabajo* v. *New York and Porto Rico Steamship,* supra; Updegroff & McCoy: *Arbitration of Labor Disputes,* págs. 215–218 (1960). Ausentes las circunstancias apuntadas, seguiremos ceñidos a la norma doctrinal de considerar definitiva y final la decisión de un árbitro, por constituir la regla más sana compatible con la naturaleza inherente del procedimiento de arbitraje laboral."

El Juez Asociado Señor Negrón García expondrá por separado su voto expresando su inconformidad con la enmienda aquí adoptada.

Lo acordó el Tribunal y certifica el Secretario.

(Fdo.) Angel G. Hermida

*Secretario*

—O—

Voto disidente del Juez Asociado, Señor Negrón García.

San Juan, Puerto Rico, a 14 de febrero de 1975

Disiento respetuosamente del criterio mayoritario del Tribunal que elimina en reconsideración, como causa de nulidad de un laudo de arbitraje, el que el mismo ". . . impida el mejor desenvolvimiento de las relaciones obrero-patronales . . . ."

Las partes convienen en este extremo, tomando como base, y por ende este Tribunal, que la incorporación de dicha causa traerá como consecuencia que los laudos de arbitraje sean cuestionados con mayor frecuencia por carecer dicha norma de elementos definitorios concretos del alcance de su contenido, aduciéndose que no existe jurisprudencia o tratadista que sostenga la misma.

La formulación de derecho por propia naturaleza es dinámica, moldeado a la luz de las variantes que las circunstancias en momento dado exigen. Nuevas fronteras del derecho, en particular en el área fluida de las relaciones obrero-patronales hacen imperativo que este Tribunal, con visión de vanguardia, amplíe en toda su extensión los criterios rectores que rigen el campo del arbitraje laboral específicamente el compulsorio legislativo. No puede ser fundamento válido en ningún área del derecho, que la génesis de una norma no esté apoyada propiamente en jurisprudencia o tratadista en particular. La historia del proceso judicial universal derrota tal contención.

Al coincidir este Tribunal con los planteamientos de las partes, debilita la formulación de normas rectoras en el novedoso campo del arbitraje compulsorio legislativo, negándose a sí mismo la función que por décadas ha ejercido como arquitecto de los procedimientos de arbitraje en nuestro país. La ausencia de sentir legislativo sobre el particular constituye el mejor ejemplo de la gran responsabilidad que hemos tenido.

El cerrar las puertas a la causal del mejor desenvolvimiento de las relaciones obrero-patronales implica en este caso, como en casos análogos, que los árbitros designados en virtud de un estatuto como el que nos ocupa, poseen facultades irrestringidas no poseídas siquiera por este foro.