# 2003 DTA 77

RECEIVED

SERIALS DEPT.
HARVARD LAW SCHOOL LIBRARY

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL DE SAN JUAN**
**PANEL IV**

UNION GENERAL DE TRABAJADORES (UGT)
Peticionaria

v.

CORPORACION DE PUERTO RICO PARA LA DIFUSION PUBLICA
Recurrida

Núm. KLCE-02-00982

Revisión Judicial de Laudo de Arbitraje Núm. A-828-98

San Juan, Puerto Rico, a 22 de abril de 2003

Panel integrado por su Presidente, Juez Gierbolini
y los Jueces Cordero y Rodríguez Muñiz

Cordero, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Oportunamente, la Unión General de Trabajadores ("*UGT*") solicitó mediante *Certiorari* la revisión de una Sentencia emitida por el Tribunal de Primera Instancia el 9 de julio de 2002, notificada el 21 de agosto de 2002, en la cual confirmó cierto laudo de arbitraje que dispuso que la controversia en el caso de autos no era procesable.

### I

En el presente caso no existen controversias en cuanto a los hechos que dan origen al mismo. Las relaciones obrero-patronales entre la UGT y la Corporación de Puerto Rico para la Difusión Pública ("*Corporación*"), se rigen, en esencia, por el Convenio Colectivo ("*Convenio*") suscrito por ésta el 1ro de enero de 1995.

El 8 de julio de 1996, la Corporación otorgó un nombramiento de Operador de Equipo de Televisión a Miguel Hernández Flores ("*Hernández*") con un salario básico de $1,425.00. Este nombramiento fue notificado por la Corporación a la UGT mediante copia de la hoja de Informe sobre Empleados Nuevos de la Unidad Apropiada el 12 de julio de 1996. El 27 de junio de 1997, la UGT solicitó a la Corporación un desglose de todos los empleados en la Unidad Apropiada con sus respectivos puestos, salario y fecha de antigüedad. Así lo proveyó la Corporación el 17 de julio de 1997.

La UGT, mediante carta de 4 de agosto de 1997, cuestionó una disparidad injustificada en los salarios devengados por los operadores de equipo de televisión que fueron nombrados con anterioridad a Hernández, aun cuando éstos realizaban la misma función. El 9 de septiembre de 1997, la Corporación contestó a lo alegado indicando que la razón para que algunos operadores de equipo de televisión devenguen mayores salarios que otros obedece a factores como mayor experiencia y/o mayor preparación académica. Inconforme, la UGT optó por acogerse al Procedimiento de Quejas, Agravios y Arbitraje, al amparo del Artículo VIII del Convenio vigente.

Así las cosas, se radicó querella ante el Vicepresidente de la Corporación a cargo del Departamento de Master Control el 18 de septiembre de 1997 en la que se alegó que el patrono violentó los artículos III, XXIII y XLVIII al ofrecer en el momento de reclutamiento un salario básico mayor a Hernández. La Corporación contestó, el 29 de septiembre de 1997, indicando que la querella no era arbitrable procesalmente, ya que la misma no fue instada dentro del término de siete (7) días laborables provisto por el Convenio.

Discorde con la Corporación, la UGT procedió con la querella en una segunda etapa el 6 de octubre de 1997 con el mismo planteamiento ante el Departamento de Recursos Humanos. El 20 de octubre de 1997, la Corporación reafirmó que la querella era tardía, por lo que la UGT optó por ventilar la querella en arbitraje.

Las partes seleccionaron el árbitro y lograron un acuerdo de sumisión que consiste en:

*"Que la Honorable Arbitro determine si la querella es o no arbitrable procesalmente, esto es, si se radicó dentro de los términos provistos por el Convenio Colectivo entre las partes.*

*De determinarse que es arbitrable procesalmente, que la árbitro señale fecha para la vista en los méritos de la presente querella."*

La Corporación argumentó que la UGT incumplió con los términos provistos en el Procedimiento de Quejas, Agravios y Arbitraje. Arguyó que la UGT tuvo conocimiento del nombramiento y salario de Hernández desde el 12 de julio de 1996, por lo que entiende que es a partir de esta fecha que la UGT tenía siete (7) días laborables para radicar su querella y no lo hizo. Por tanto, la misma estaría prescrita. Igual conclusión se llegaría si la fecha que se tomara en consideración fuera el 17 de julio de 1997 cuando la Corporación remitió a la UGT un listado de empleados unionados con sus respectivos títulos, salarios y fecha de antigüedad.

Por su parte, la UGT argumentó que la controversia no se materializó hasta el 9 de septiembre de 1997 cuando la Corporación dio a conocer su posición en torno a la disparidad del salario y no cuando ésta informó el salario de Hernández.

El·árbitro falló a favor de la Corporación por entender que la UGT incumplió con los términos dispuestos del Convenio, ya que radicó la querella ante la consideración de la Corporación en exceso del término dispuesto en el Convenio.

La UGT acudió ante el Tribunal de Primera Instancia solicitando la revocación de la decisión del Arbitro por entender que éste incidió en derecho al obviar la aplicación de la doctrina de violación continua al determinar que la querella no era arbitrable procesalmente. El Tribunal de Primera Instancia confirmó el laudo de arbitraje por entender que éste fue conforme a derecho y a tenor con la norma establecida en *Corporación de Puerto Rico para la Difusión Pública v. U.G.T.,* \_\_\_D.P.R.\_\_\_ (18 abril 2002), **2002 J.T.S. 60**.

UGT acude ante nos y señala que:

*"1. Erró el Tribunal de Primera Instancia al confirmar el laudo de arbitraje recurrido en el cual la árbitro resolvió que la querella no era arbitrable procesalmente; obviando la doctrina de violación continua.*

*2. Erró el Tribunal de Primera Instancia al utilizar como precedente para confirmar el laudo recurrido una sentencia del Tribunal Supremo de P.R. en el caso Corporación de P.R. para la Difusión Pública v. Unión General de Trabajadores, 2002 J.T.S. 60; obviando la opinión del propio foro judicial en el caso Junta de Relaciones del Trabajo v. Autoridad de Energía Eléctrica, 112 D.P.R. 564 (1982)."*

Procedemos a discutir ambos errores conjuntamente por entender que éstos están relacionados. Veamos.

## II

En nuestra jurisdicción existe una vigorosa política pública a favor del arbitraje. En lo que respecta a la autoridad del árbitro para entender en una controversia, ésta queda definida por la cláusula de arbitraje convenida así como por el acuerdo de sumisión sometido por las partes, amén de aquella autoridad que pueda serle conferida para confeccionar el remedio que corresponda. Se constituye, pues, dicho acuerdo, en definitorio de los asuntos a ser decididos y es lo que controla, junto con las disposiciones aplicables del convenio colectivo, el ámbito de autoridad del árbitro o panel de arbitraje seleccionado por las partes con tal finalidad. A través del arbitraje, se pretende promover la resolución de las querellas y controversias que se suscitan dentro del marco obrero-patronal, habiéndose reconocido que el arbitraje pactado en el convenio constituye una herramienta ideal

para fortalecer la negociación colectiva. *J.R.T. v. Junta Adm. Muelle Mun. Ponce*, 122 D.P.R. 318, 330 (1988); *Pérez v. Autoridad Fuentes Fluviales*, 87 D.P.R. 118, 124 (1963).

Es un principio establecido en nuestro ordenamiento jurídico que los laudos de arbitraje emitidos en el campo laboral gozan de gran deferencia por parte de los tribunales, *S.I.U. de P.R. v. Otis Elevator Co.*, 105 D.P.R. 832, 836 (1977); *Pagán v. Fund. Hosp. Dr. Pila*, 114 D.P.R. 224, 231 (1983); *U.I.L. de Ponce v. Dest. Serrallés, Inc.*, 116 D.P.R. 348, 353-354 (1985); *J.R.T. v. Hato Rey Psychiatric Hosp.*, 119 D.P.R. 62, 68 (1987); *J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra*, a la pág. 325; siendo la norma de revisión de dichos laudos una de autorestricción o abstención judicial. *Colón Molinary v. A.A.A.*, 103 D.P.R. 143, 155 (1974); *J.R.T. v. National Packing Co.*, 112 D.P.R. 162, 165 (1982); *U.I.L. de Ponce v. Dest. Serrallés, Inc., supra*, a la pág. 353; *J.R.T. v. Hato Rey Psychiatric Hosp., supra*, a la pág. 67.

Lo antes expresado responde a que las partes, una vez firman un convenio colectivo donde someten sus disputas obrero-patronales a un procedimiento de arbitraje, sustituyen al árbitro por las cortes para resolver estas disputas. *U.G.T. v. Challenger Caribbean Corp.*, 126 D.P.R. 22, 29 (1990); *J.R.T. v. N.Y. & P.R. S/S*, 69 D.P.R. 782, 800-801 (1949).

Ahora bien, cuando el laudo es emitido conforme a derecho significa:

*"Condicionar un laudo a que sea `conforme a derecho' significa que el árbitro no puede ignorar las normas interpretativas de derecho sustantivo emitidas por los Tribunales Supremos de Estados Unidos y Puerto Rico en el campo de derecho laboral, y que se reputarán persuasivas las decisiones de los tribunales de primera instancia y de agencias administrativas, y los laudos y escritos de reputados árbitros."* J.R.T. v. Hato Rey Psychiatric Hosp., supra, pág. 68.

Cuando las partes expresen en el convenio colectivo o en el acuerdo de sumisión que el laudo deberá ser emitido conforme a derecho, *"los árbitros deben seguir las reglas de derecho y rendir sus laudos a tenor con las doctrinas legales prevalecientes. Si el convenio de arbitraje nada dice en cuanto a esto, de conformidad con lá Ley Común y bajo la mayoría de las leyes de arbitraje, los árbitros pueden declarar cuál es la ley y ningún laudo será anulado a causa de sus errores de derecho."* Junta de Relaciones del Trabajo v. N.Y. & P.R. S/S. Co., supra, a las págs. 797-800; *Autoridades sobre Hogares v. Tribl. Superior*, 82 D.P.R. 344, 354 (1961).

### III

Entre otros asuntos que pueden ser encomendados al árbitro, se encuentra la determinación de su propia jurisdicción, a la luz del convenio. *J.R.T. v. N.Y. & P.R. S/S Co., supra*, a la pág. 803; véanse, además, *J.R.T. v. Corp. de Crédito Agrícola*, 124 D.P.R. 846, 850-851 (1989); véase, *J.R.T. v. Central Mercedita, Inc.*, 94 D.P.R. 502, 509-510 (1967). La determinación de si el agravio se procesó dentro del término estipulado y de la manera convenida en el convenio colectivo, constituye un asunto medular a ser decidido por el árbitro. Elkouri & Elkouri, *How Arbitration Works*, 5th ed., Washington D.C., The Bureau of National Affairs, 1985, págs. 283, 305-307.

Establecido un proceso para la tramitación de quejas y agravios, éste es fundamental. El incumplimiento con los términos y procedimientos establecidos en el Convenio conlleva la desestimación de la querella, pues se pretende que la tramitación de los agravios sea pronta y diligente. Esto significa que transcurridos los mencionados períodos ha caducado la acción que pudiera poseer el empleado. Más importante aún, la omisión de cumplir con los términos establecidos en el convenio conlleva que la acción se entienda como prescrita. El problema de si se cumplió con el término convenido para tramitar el agravio es crítico. El agravio presentado fuera del término prescrito será rechazado. Demetrio Fernández Quiñones, *El Arbitraje Obrero-Patronal*, 1era Ed., Colombia, Legis, S.A., 2000, a la pág. 723.

En lo que concierne al caso ante nos, y respecto de los salarios, se ha discutido que la posible salvación a la pérdida de una reclamación presentada transcurrido el proceso pactado en el Convenio puede encontrarse en que la violación sea de carácter continua. La teoría es que ciertas violaciones al contrato colectivo no sin infinitas, pero ocurren una y otra vez y pueden ser cuestionadas cada vez que surgen. Ello es así, independientemente de cuándo surgió por primera vez y de la restricción prescrita en el convenio. Demetrio, *El Arbitraje Obrero-Patronal, supra,* a la pág. 724.

En los Estados Unidos, distintos autores admiten la existencia de violaciones continuas a un convenio, que conllevan la renovación del término para reclamar bajo el procedimiento de quejas y agravios que se hubiera podido adoptar bajo un convenio.

El profesor Elkouri observa:

*"Many arbitrators have held that "continuing violations of the agreement (as opposed to a single isolated and completed transaction) give rise to "continuing" grievances in the sense that the act complained of may be said to be repeated from day to day --each day there is a new "occurrence"; these arbitrators have permitted the filing of such grievances at any time, this not being deemed a violation of the specific time limits stated in the agreement (although any back pay ordinarily runs only from the day of filing). For example, where the agreement provided for filing "within ten working days of the occurrence", it was held that where the employees were erroneously denied work, each day lost was to be considered a new "occurrence" and that a grievance presented within 10 working days of any such day lost would be timely."* (Enfasis suplido) Elkouri & Elkouri, *How Arbitration Works, supra,* a las págs. 281-82.

Por su parte, el profesor Fairweather señala:

*"If the grievant continues to suffer from the alleged contract violation, the arbitrator may find that the violation is a continuing one. In such a case, the limitations period recommences each day; hence, the time for filing the grievance is extended. For example, a company's failure to discharge an employee who does not join a union within 31 days is never barred because the failure constitutes a "continuing violation." The "continuing violation" doctrine is used most frequently by grievants seeking damages because an employer failed to pay the established wage rate for the employee's classification or failed to grant a merit increase. Recently, arbitrators have applied continuing violation theory in a number of other contexts."* (Enfasis suplido) Ray J. Schoonhoven, *Fairweather´s Practice and Procedure in Labor Arbitration,* Washington, D.C., The Bureau of National Affairs, Inc., 1991, a la pág. 86.

La aplicación de la doctrina de daños continuos en el campo laboral es cónsona y encuentra apoyo en que el Tribunal Supremo ha admitido la existencia de los *"daños sucesivos"* y los *"daños continuados"* que pueden afectar el transcurso del término prescriptivo. *Rivera Encarnación v. E.L.A.,* 113 D.P.R. 383, 386 (1982). Los primeros incluyen aquellas situaciones en que una sola conducta torticera inicial continúa produciendo consecuencias lesivas, las cuales, sin embargo, se consideran imprevisibles, desde el punto de vista jurídico, toda vez que dependen de que el actor continúe un curso de conducta ilícito. Véase, Herminio Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico,* Vol. II, 2da edición, **Publicaciones JTS,** 1986, a las págs. 568, 644-645.

Por su parte, los daños continuados consisten en *"aquellos producidos por uno o más actos culposos o negligentes imputables al actor, coetáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas, duraderas sin interrupción, unidas entre sí, las cuales al ser conocidas hacen que también se conozca --por ser previsible--, el carácter continuado e ininterrumpido de sus efectos, convirtiéndose en ese momento en un daño cierto compuesto por elementos de daño actual (aquél que ya ha acaecido) y de daño futuro previsible."* Galib Frangie v. El Vocero de Puerto Rico, Inc., 138 D.P.R. 560, 574 (1995), (citando a H.

Brau, *supra*, a la pág. 648); véase, además, *Rivera Encarnación v. E.L.A., supra*, a la pág. 385.

Así se ha interpretado que en el caso de daños continuos el término de prescripción para el ejercicio de cada una de las acciones comienza a contar en el momento en que se reconoce el respectivo daño particular. Dicho en otra forma, con sujeción a la doctrina cognoscitiva del daño, cada manifestación y reconocimiento de una consecuencia lesiva motivada por una actuación culposa o negligente efectuada por el actor, constituye un daño distinto que origina una causa de acción resarcitoria independiente. Herminio Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico, supra*, a las págs. 643-44. Véase además Reglero Campos, *De la Prescripción de las Acciones*, tomo XXV, Vol. 2, Comentarios al Código Civil, Revista de Derecho Privado, a las págs. 458 y 459, n. 14 (1994).

Lo único que hallamos como precedente sobre esta cuestión en el campo laboral está discutido por el Tribunal Supremo en el caso resuelto mediante opinión *per curiam, J.R.T. v. A.E.E.,* 113 D.P.R. 564 (1982). Allí, el Tribunal Supremo resolvió en un caso donde se reclamó un derecho al aumento de sueldo por años de servicios que no procede el planteamiento de caducidad por haber transcurrido el tiempo para presentarla, ya que se trata de una reclamación de carácter continuo. El Tribunal Supremo expresó:

*"Cada vez que la Autoridad paga el salario sin incluir el aumento por años de servicio, surge nuevamente la causa de acción. El único efecto de la tardanza en hacer la reclamación es que la decisión podría retrotraerse únicamente hasta seis meses antes de la reclamación, por así disponerlo la Sec. 3 del Art. XXXIX del convenio colectivo".* (Enfasis suplido.) *J.R.T. v. A.E.E., supra*, a la pág. 567.

Ciertamente, el Tribunal Supremo consideró que el factor determinante para el discernimiento de la existencia de una violación continua es el acto que causó la queja o el agravio y no el enfoque en sus efectos, por lo que el remedio a concederse en los casos en que se determine que existe una violación de carácter continuo, se otorgará desde que la querella fue presentada y no desde que ocurrió el acto inicial que dio origen al agravio.

Posteriormente, en la Sentencia █ emitida por el Tribunal Supremo en el caso *Corporación para la Difusión Pública v. Unión General de Trabajadores, supra,* a la pág. 996, dicho foro en un caso de aumento por mérito, rechazó un planteamiento similar de agravio continuo indicando que:

*"La decisión patronal de concederlos no constituye una violación de carácter continuo al Convenio Colectivo, porque dichos aumentos no estaban contemplados en el mismo. No estando contemplados los referidos aumentos por mérito en el Convenio Colectivo, su concesión era prerrogativa discrecional de la gerencia. La decisión de concederlos constituyó un sólo acto o acción única, que tuvo la consecuencia de procurar mayores ingresos a ciertos empleados. Si la U.G.T. quería cuestionar los aumentos concedidos, debía cumplir con los pasos y términos específicos contemplados en el proceso de ventilación de quejas, agravios y arbitraje para el encausamiento de las querellas. Esta última no cumplió con presentar la querella dentro del término de siete (7) días laborales para iniciar el primer paso del procedimiento desde la ocurrencia del hecho que dio margen al agravio. Por lo tanto, la querella presentada por la U.G.T. no era arbitrable procesalmente."* (Enfasis suplido.)

Aquí, el Tribunal Supremo no acogió la teoría de daño continuo, ya que la controversia en ese entonces no podía ser de naturaleza continua, puesto que la concesión del aumento por mérito no formaba parte del convenio y por tanto la decisión de conceder mismo constituyó un sólo acto que tuvo la consecuencia de procurar mayores ingresos a ciertos empleados.

Ciertamente, estamos de acuerdo con la UGT en su planteamiento de que el Tribunal de Primera Instancia no debió fundamentar su adjudicación en el caso de la *Corporación para la Difusión Pública v. Unión General*

*de Trabajadores, supra*, ya que el mismo fue resuelto mediante el mecanismo de Sentencia, lo que significa que no establece precedente. No debemos olvidar que se considera que no es apropiado citar como autoridad o precedente las sentencias que no constituyen opinión del Tribunal Supremo, ya que bajo esta perspectiva, se entiende que una sentencia sin opinión, cuya publicación no ha sido ordenada por el Tribunal Supremo y que ha sido publicada por razón de que un Juez de dicho Tribunal ha certificado una opinión concurrente o disidente o un voto particular, no tiene valor de precedente y sí el valor persuasivo intrínseco de sus fundamentos. *Rivera Maldonado v. E.L.A.*, 119 D.P.R. 74, 80 (1987); Regla 44 del Reglamento del Tribunal Supremo.

Como vemos, no existe un enfoque claro sobre la doctrina de daño continuo en el sector obrero-patronal. Por una parte, mediante opinión en *J.R.T. v. A.E.E., supra*, el Tribunal Supremo concluyó que cada vez que se hace el pago surge una nueva causa de acción, por lo que el mismo es de naturaleza continua y procesable; sin embargo, recientemente mediante Sentencia, dispone que el aumento por mérito en el caso de la *Corporación para la Difusión Pública v. Unión General de Trabajadores, supra*, no es de naturaleza continua y, por tanto, no es procesable si no cumple con los términos del procedimiento de quejas y agravios. Los pronunciamientos emitidos por el Tribunal Supremo indudablemente acogen la doctrina de daños continuos en el sector orbrero-patronal, *J.R.T. v. A.E.E., supra*. Resolvemos que la aplicación de la doctrina de daño continuo procede en aquellos casos donde el daño es el resultado de un incumplimiento que surge del Convenio entre las partes.

Así, pues, procede examinar el Convenio entre la Corporación y la U.G.T. para verificar si el salario de la unidad apropiada fue sujeto de negociación entre éstas.

## IV

En el caso de autos, el Convenio entre las partes comprende las controversias que giren en torno al salario y clasificación de los puestos. Así, el convenio establece entre otros que habrá un Plan de Retribución Uniforme (Artículo XXXII, Sección 1), el trato uniforme entre los empleados a fin de mantener las mejores relaciones entre los empleados (Art. XLI, Sección 1), la concesión de aumentos de salarios (Art. XXV, Sección 1), y, además, obliga a la Corporación a proporcionar información sobre el salario de los empleados unionados (Art. XIV, Sección 1). Mediante el Convenio suscrito por las partes, la Corporación reconoció a la UGT como el representante exclusivo de los empleados comprendidos en las unidades apropiadas definidas en el mismo, a los fines de negociar salarios, las horas de trabajo, sus beneficios marginales, los términos y condiciones de trabajo y el cumplimiento de sus términos. (Art. II, Sección I).

Ciertamente, este Tribunal concluye que la concesión del salario básico está comprendida dentro del Convenio que rige la controversia ante nos. Por tanto y según lo antes discutido, nos corresponde establecer si en el caso de marras existe un daño continuo y si éste fue solicitado de acuerdo al procedimiento establecido entre las partes a través del Convenio.

## V

El Convenio establece un procedimiento para el trámite de quejas y agravios en el Artículo VIII, el cual disponía, entre otras cosas, que, como primer paso del procedimiento, toda querella debía ser presentada al supervisor inmediato de los empleados envueltos *"dentro de siete (7) días laborables de la ocurrencia del hecho que dio margen al agravio"*. En caso de que dicha alternativa fuese insuficiente para resolver la controversia, los empleados debían acudir al Director de Recursos Humanos. Como último paso, se autorizaba recurrir a arbitraje ante el Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Recursos Humanos de Puerto Rico.

La sección 7 del Artículo VIII del Convenio establecía que los términos establecidos en dicho artículo: serían

*"improrrogables y jurisdiccionales para todas las partes, excepto que la Corporación y la Unión a través*

*de sus representantes u oficiales decidan por acuerdo suscrito por ambos extender cualquier término particular, en cuyo caso se especificará el tiempo del nuevo término acordado.*"

Por su parte, la sección 6 disponía que:

*"Las decisiones en el laudo del árbitro resolviendo la controversia o asunto será conforme a derecho, final y obligatoria para ambas partes."*

En su acuerdo de sumisión, las partes solicitaron al árbitro que adjudicara la arbitrabilidad procesal de la querella para determinar si ésta se radicó dentro de los términos provistos en el Convenio y, obviamente, esta determinación sería resuelta conforme a derecho. Así, el laudo debió seguir las reglas de derecho y rendir su decisión a tenor con las doctrinas legales prevalecientes.

Los hechos redactados demuestran que el 8 de julio de 1996, la Corporación extendió a Hernández un contrato de empleo con un salario básico de $1,425.00 el cual le fue notificado a la UGT el 12 de julio de 1996. Luego, la UGT solicitó el desglose de los empleados unionados con sus respectivos salarios el cual fue proporcionado el 17 de julio de 1997. Así las cosas, la UGT cuestionó la diferencia de salario el 4 de agosto de 1997. La Corporación indicó el 9 de septiembre de 1997 que la misma era justa y equitativa. Es entonces que la UGT decidió acogerse al procedimiento de quejas y agravios mediante la presentación de querella el 18 de septiembre de 1997. El Patrono contestó el 29 de septiembre de 1997 alegando que la causa estaba prescrita. Así, el 6 de octubre de 1997, la UGT continuó con el procedimiento presentando la querella ante el Departamento de Recursos Humanos; éste, el 20 de octubre de 1997, reafirmó que la querella estaba prescrita, por lo que las partes acudieron a arbitraje.

El árbitro, por su parte, determinó que la UGT incumplió con los procedimientos al no someter la querella a partir del 17 de julio de 1997 cuando la Corporación informó el salario de Hernández. El laudo de arbitraje debió ser emitido conforme a derecho, por lo que el árbitro debió determinar, en primer lugar, que el salario es parte de la negociación entre las partes, para luego proceder a aplicar la teoría de daño continuo y resolver si la querella era procesable conforme a ésta.

De acuerdo con todo lo antes discutido, hoy resolvemos que el daño en cuestión es uno de naturaleza continua. Cada vez que la Corporación paga a Hernández, surge nuevamente una causa de acción en beneficio de los empleados unionados que no están retribuidos uniformemente. Por tanto, la UGT podía reclamar el derecho de sus representados en cualquier momento. El único efecto que acarrea la tardanza en la reclamación es que sólo se puede retrotraer a la fecha en que la UGT presentó la querella.

## VI

Efectivamente, el laudo de arbitraje, en el caso ante nos, debía emitirse conforme a derecho, por lo que el árbitro debió regirse por la doctrina de derecho prevaleciente. No lo hizo. En virtud de todo lo anterior, se expide el auto, se revoca la sentencia recurrida, se anula el laudo, y se devuelve la controversia al árbitro, a los fines de que se encauce ésta bajo los procedimientos que sean pertinentes conforme el convenio colectivo y la sumisión que finalmente se formule de acuerdo a éste, tomando en cuenta lo dispuesto en esta sentencia.

El Juez Gierbolini disiente sin opinión escrita.

Lo acuerda y manda este Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

---

**ESCOLIO 2003 DTA 77**

**1.** Hacemos referencia al caso, en vista de que el Tribunal de Primera Instancia fundamentó su decisión en dicha Sentencia y la parte recurrente nos señala el error. La norma es clara al establecer que no es apropiado citar como autoridad o precedente las sentencias que no constituyen opinión del Tribunal Supremo. Véase *Rivera Maldonado v. E.L.A.,* 119 D.P.R. 74, 80 (1987).